(75 South. 498)

No. 22173.

Succession of PIZZATI.

(Jan. 15, 1917. On Application for Rehearing, Feb. 12, 1917. On Rehearing, May 16, 1917.)

*(Syllabus by Editorial Staff.)*

1. WILLS ☞182—REVOCATION—INTENTION—STATUTE.

Under Rev. Civ. Code, art. 1693, providing that subsequent wills not expressly revoking former wills annul in the former wills only such dispositions therein as are incompatible with the new dispositions, or contrary to them, the incompatibility or contrariety need not be physical or legal, but intentional only; as the question of implied revocation is purely one of intention.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 460.]

2. WILLS ☞324(4) — CONSTRUCTION—INTENTION.

The question of a testator's intention is one of fact purely, and if he was not in fact versed in law, no deduction can be made from the presumption that he knew the law.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 225, 770.]

3. WILLS ☞822 — UNIVERSAL LEGATEE — STATUTORY DUTY—CONSTRUCTION.

Rev. Civ. Code, art. 1611, providing that the universal legatee "is bound to discharge all the [special] legacies," while legacy of a part is in fact inconsistent with a legacy of the whole, they need not necessarily be so in intention; and when testator gives a part to one person and the whole to another, it must be assumed that he intended that the will should be carried out as he made it in all its parts, and, notwithstanding the inconsistency, the nearest that can be done is to assign a part to one and the remainder to the other, though this is not true when the two dispositions are contained in two wills at different dates.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 2120.]

4. WILLS ☞527—CONSTRUCTION—UNIVERSAL LEGACIES.

Where testator by a later will, inconsistent with the legacies contained in a former will, gives all his disposable property to a universal legatee, the will will be construed as if he meant what he plainly expressed in the later will, especially where each of his wills carries a complete disposition of his entire estate and contains recitals which would have been superfluous in a will intended to be merely additional to or designed to be read in connection with another, and where all the special legacies stand upon the same footing.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1140.]

5. WILLS ☞740(4)—AGREEMENT BETWEEN INTERESTED PARTIES—EFFECT.

A testamentary executor, no party to an agreement between the widow, an alleged adopted son, and the universal legatee as to the part each should receive, is not bound by it, and if its validity was being contested for reasons which appeared to be good, he would not be bound to recognize it in his account, but might ignore it and let the parties thereto set it up in opposition to his account.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1892–1894.]

6. EXECUTORS AND ADMINISTRATORS ☞314(10) — SUCCESSION — FORM OF ACCOUNT — ADOPTION.

Where a testamentary executor became advised that there had been no adoption of a son by the testator, and that in the absence of an adoption the one-half of the estate would go to the residuary legatee, his duty was to frame his account accordingly.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1287, 1289.]

7. EXECUTORS AND ADMINISTRATORS ☞504(1) —SUCCESSION—OPPOSITION TO EXECUTOR'S ACCOUNT—PLEADING AND ISSUES.

Allegations made in the oppositions to a testamentary executor's final account as to tes-

tator's alleged adoption of a son, and as to the validity of the agreement between the widow, the adopted son, and the universal legatee, were open to every objection of law and fact as if such objections had been specially pleaded; as the oppositions to an executor's account are in the nature of answers and stand as such.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2157, 2165.]

8. EXECUTORS AND ADMINISTRATORS ⟐⟐504(7) —SUCCESSION—FINAL ACCOUNT—REPRESENTATION OF SHARE OF ADOPTED SON.

A testamentary executor in defending his final account represents whoever will be entitled to take an adopted son's share of the estate should the adoption be set aside.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 2167.]

9. ADOPTION ⟐⟐3—CONSTRUCTION OF STATUTE—ADOPTION OF MINORS.

Rev. St. § 2328, under the title "An act relative to the adoption of minors and the form of proceedings," and found in a chapter headed "Minors," and under the subhead, "Adoption of Minors," taken verbatim from Act No. 64 of 1868, referring to the adoption of both majors and minors, applies only to minors.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 1, 2.]

10. STATUTES ⟐⟐111—SUBJECT AND TITLE— ADOPTION.

Under the constitutional provision requiring the object of every act to be expressed in its title, legislation on the subject of the adoption of majors would not be responsive to a title relative to the adoption of minors.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 140.]

11. ADOPTION ⟐⟐3 — MAJORS — REPEAL OF STATUTES.

Act No. 64 of 1868, relating to the adoption of both majors and minors, carried forward as Rev. St. § 2328, so far as majors are concerned, was not repealed by the repealing clause of the Revised Statutes covering all laws in conflict or on the same subject-matter; as section 2328, construed as applying only to the adoption of minors, is not on the same subject-matter as a law relative to the adoption of majors.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 1, 2.]

12. ADOPTION ⟐⟐3 — FORM — VALIDITY OF STATUTE.

Rev. Civ. Code, art. 214, providing that any person may adopt a major as well as a minor, but making no provision for the mode of effecting the adoption of a major, is defective and inoperative.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 1, 2.]

13. ADOPTION ⟐⟐10—FORM OF PROCEEDING— NOTARIAL ACT.

The Legislature not having furnished the means of effecting the adoption of a major, the courts cannot do so; and, though a notarial act may show an intention to adopt, adoption cannot result from the mere manifestation of an intention to adopt, or from the combined manifestation of an intention to adopt and to be adopted.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. § 16.]

14. EQUITY ⟐⟐55—MAXIMS—WHERE THERE IS A RIGHT THERE IS A REMEDY.

The maxim that where there is a right there is a remedy means nothing more than that whatever may be due to one may be demanded judicially in some form or other, and that the courts are open for vindication of all rights, no matter what they may be.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 177.]

15. STATUTES ⟐⟐47 — UNCERTAINTY — ADOPTION—MAXIMS.

Where the Legislature permits the adoption of a major without furnishing the means of effecting the adoption, the maxim, that when anything is granted, that also is granted without which the thing granted cannot exist, cannot help the situation.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 47.]

16. STATUTES ⟐⟐47 — UNCERTAINTY — ADOPTION—FAILURE TO PRESCRIBE PROCEEDINGS —EFFECT.

Rev. Civ. Code, art. 214, permitting the adoption of a major without prescribing a means of effecting the adoption, the maxim applicable is, "Ubi jus incertum, ibi jus nullum;" where the law is uncertain, there is no law.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 47.]

17. DESCENT AND DISTRIBUTION ⟐⟐82—SUCCESSION — HEIRSHIP — CONTRACTS — INVALIDITY—MISTAKE.

Under the express provision of Rev. Civ. Code, art. 1838, an agreement between a widow, an alleged adopted son, and a universal legatee, entered into in the belief that there had been an adoption, when in fact there had been none, was invalid.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 318–321.]

18. ESTOPPEL ⟐⟐78(1)—INVALID AGREEMENT.

An agreement between a widow, an alleged adopted son, and a universal legatee being null by reason of mistake, want of consideration, etc., cannot serve as a basis for estoppel.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 204, 210.]

**19. DESCENT AND DISTRIBUTION ⬤⟝82—SUC-CESSION—AGREEMENTS OF HEIRS—CONFIRM-ATIVE ACT.**

A null agreement between a widow, a universal legatee, and an alleged adopted son cannot operate as a recognitive and confirmative act where it does not, as required by Rev. Civ. Code, art. 2272, contain an express mention of the grounds of nullity intended to be waived, as well as an express waiver of them.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 318–321.]

**20. PHYSICIANS AND SURGEONS ⬤⟝23—CLAIMS AGAINST ESTATE — SERVICES — AMOUNT.**

Services of a practicing physician who attended decedent from November 2d to December 30th following, when he died, in treating him for pneumonia, would be reasonably and fairly compensated by an allowance of $1,000.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 52.]

**21. HUSBAND AND WIFE ⬤⟝273(5)—FUNERAL EXPENSES—CHARGE TO HUSBAND'S HALF OF COMMUNITY PROPERTY.**

Where funeral expenses were incurred after the community of acquêts and gains had been dissolved by the husband's death, they should be charged, not to the community, but to his half of the community property.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1013.]

**22. EXECUTORS AND ADMINISTRATORS ⬤⟝494—SUCCESSION—COMPENSATION OF EXECUTORS—ATTORNEY'S FEE.**

Where the testamentary executor was himself a lawyer, he might be allowed for his services as the executor's attorney in the settlement of the succession.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2084–2087.]

*On Rehearing.*

*(Syllabus by the Court.)*

**23. WILLS ⬤⟝5, 6—DISPOSABLE PORTION OF ESTATE—DETERMINATION.**

The disposable portion of an estate is determined by the disposing capacity of the testator at the time of his death, which, in turn, is determined by the existence or nonexistence of forced heirs. If there are no forced heirs, he is capable of disposing of his entire estate, and a bequest of the disposable portion operates as a universal legacy, and includes the entire estate; and that is true, notwithstanding that, when the will was made, the testator may have believed that he had legally adopted a son, if it be shown, after his death that the attempted adoption was illegal and inoperative.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 4, 5–10, 14.]

**24. WILLS ⬤⟝179—LEGACIES UNDER FORMER WILL—EFFECT OF SUBSEQUENT WILL.**

When the latest will disposes of the entire estate of the testator, there can be nothing left of legacies, in prior wills, disposing of the same estate, or of any part of it, to other legatees.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 456, 457.]

**25. DESCENT AND DISTRIBUTION ⬤⟝82—CONTRACT—ENFORCEABILITY.**

Where in a contract purporting to divide an estate in certain proportions one of the contracting parties has acted in a capacity which he was believed to possess, but, as it was afterwards ascertained, did not possess, and the error as to his quality was vital, and another acted under a mandate conceived in terms which were insufficient to authorize him to bind his principal, the contract cannot be enforced.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 318–321.]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

In the matter of the final account of John A. Woodville, testamentary executor under the will of Salvatore Pizzati, deceased, opposed by Robert Woodville, legatee, Mrs. Salvatore Pizzati, widow in community, Marco Antonio Pizzati, an adopted son, Doctor T. R. Rudolph, Horace H. Newman, and certain allied charities. From the judgment on opposition to final account, the executor, Robert Woodville, legatee, the widow, adopted son, Dr. Rudolph, Horace H. Newman, and the several particular legatees under previous wills appeal. Judgment amended as to amount allowed Dr. T. R. Rudolph, set aside as to the allowance to the adopted son and in so far as it rejects the claim of Horace H. Newman, and otherwise affirmed, and case remanded for further evidence on opposition of Horace H. Newman.

Dinkelspiel, Hart & Davey, of New Orleans, for appellant Woodville. J. L. Warren Woodville, of New Orleans, for executor and legatee. Edgar M. Cahn, of New Orleans, for appellant widow in community. Armand Romain, of New Orleans, for appellant Rudolph. Foster, Milling, Saal & Milling, of New Orleans, for appellant Newman. Delvaille H.

Théard and Dart, Kernan & Dart, all of New Orleans, for appellant adopted son. Hall, Monroe & Lemann, Roger Meunier, Andrew M. Buchmann, James J. McLoughlin, Denegre, Leovy & Chaffe, A. D. Danziger, F. J. Dreyfous, and W. W. Young, all of New Orleans, for allied charities.

PROVOSTY, J.    The de cujus left six wills, all in nuncupative by public act form, dated, respectively, March, 1906, January, 1910, January, 1911, June, 1911, October, 1911, and December, 1915, and all, except the first two by act before John A. Woodville, who is testamentary executor, and the son of Robert Woodville, the ·beneficiary under the last four wills, and was the intimate friend and legal adviser of the de cujus in the last five years of his life, from January, 1911, to the time of his death, December, 1915.

The will of March, 1906, omitting mere formal parts, reads as follows:

"I declare that my name is Salvatore Pizzati. I am 66 years of age.  I have been married but once, then to Francesca Valenzano, who is now living.  No children have been born to our marriage, and my father and mother are both dead; hence I have no forced heirs.

"I give and bequeath to my friend Sam Henderson, Jr., all my personal effects that I may die possessed of, wherever situated, such as diamonds, rings, watches, chains, cuff buttons and all my jewelry; also my large box of silver; in fact, all of my personal effects, with the exception of my small box of silver, which it is my desire that my wife should receive.    I make this bequest to my friend Sam Henderson, Jr., as an extra donation over and above the usual commission which he will receive as executor of my estate.

"Subject to said bequest, I give and bequeath to my said wife, Francesca Pizzati, during her natural life or until she remarries, the use, usufruct and enjoyment of the balance of whatever I may die possessed of, whatever kind or wherever situated, and I expressly dispense her from the necessity of giving any bond or security as usufructary.

"Subject to the said usufruct, I make the following bequests:

"I give and bequeath unto the commissioners of Audubon Park and of the lower City Park of this city each the sum of five thousand dollars, to be used by them in adding to attractive-ness of the park for the benefit of little children.

"To the Eye, Ear, Nose and Throat Hospital of this city, the sum of ten thousand dollars.

"To the Maison Hospitaliers, on Barracks street, between Bourbon and Dauphine streets, one thousand dollars.

"To the Home for Homeless Men, one thousand dollars.

"To the Home for Homeless Women, one thousand dollars.

"To the Newsboys' Home, the sum of two thousand dollars.

"To the Home for Incurables, two thousand five hundred dollars.

"To St. Joseph's Church, on Tulane avenue, one thousand dollars.

"To the Convalescent Home, the sum of one thousand dollars.

"To the Jewish Widows Home, one thousand dollars.

"To the Kingsley House, the sum of one thousand dollars.

"To the Isidore Newman Manual Training School, as a compliment to my friend, Isidore Newman, one thousand dollars.

"To the St. Vincent's Orphan Asylum, one thousand dollars.

"To the Society for Prevention of Cruelty to Children, two thousand five hundred dollars.

"To the Missionary Sisters of the Sacred Heart, to be used by them for repairs to the Boys' High School, should it require repairs, and if not, for the improvement of the buildings used by them for boys, one thousand dollars.

"I give and bequeath all the rest and residue of my estate, after payment of my debts and the foregoing legacies, to the Tulane University of Louisiana, hereby constituting said University my universal legatee, upon the trust that the proceeds of this bequest be devoted to the building, equipment of a gymnasium on the grounds of the Tulane University of Louisiana, in the city of New Orleans, for the perpetual use of the students of said University, which building I desire should bear my name or some proper inscription signifying that it was given by their friend, Captain S. Pizzati.

"If at my death a gymnasium shall already have been provided for that is adequate (not referring to temporary or incomplete buildings designed for gymnastic purposes which may be demolished or removed or devoted to other purposes), then and in that event I desire and direct all of the funds derived from the estate by the said University shall be utilized in the erection, equipment and endowment of a building to be devoted to the purpose of a school of architecture, which building, it is my wish, shall bear the name or inscription that it was given by 'Captain S. Pizzati.'  I desire that my executor advise with the board of administrators of the University as to the building and its construction, and generally to assist the said board in every way to the accomplishment of the purpose I intend, which is that my fellow man shall be benefited.

"In making the above donation, it may be possible that I have not designated correctly by name the various charitable institutions to which I have made legacies, but it is my wish that no technical construction shall be made, as it is clearly my idea that those institutions, through their proper officers, whoever they may be, shall receive the amounts I have given them.

"I name and appoint Sam Henderson, Jr., as executor of my will, with seisin, and. dispense him from giving bond.

"I desire that my executor shall, in keeping with a letter that I have written him, which contains my wishes, spare no expense in connection with my burial.

"I hereby revoke and annul all last wills and testaments heretofore made by me, declaring this to be my last will and testament."

The will of January, 1911, reads as follows:

"My name is Salvatore Pizzati. I have been married but once, and then to Francesco Valenzano, who is now living with me. To my good friend Sam Henderson I will and bequeath the sum of five thousand dollars, and to the Eye, Ear, Nose and Throat Hospital the sum of ten thousand dollars, the balance of my estate I will and bequeath to my wife. I appoint and constitute as my executor with seisin and without bond my good friend, Sam Henderson."

The will of June, 1911, reads as follows:

"My name is Salvatore Pizzati. I have been married but once, and then to Francesca Valenzano, who is not living with me. To my good friend Sam Henderson I will and bequeath the sum of five thousand dollars, and to the Eye, Ear, Nose and Throat Hospital the sum of ten thousand dollars, the balance of my estate I will and bequeath to my wife and son, Marco Antonio Pizzati, share and share alike. I appoint and constitute as my executor with seisin and without bond my good friend J. A. Woodville."

The will of October, 1911, reads as follows:

"My name is Salvatore Pizzati. I have been married but once, and then to Francesca Valenzano. All of the disposable portion of my estate, real, personal and mixed, I will and bequeath to my good friend Robert Woodville, of Utilla, Spanish Honduras, whom I have known for over forty years. Should I survive him then I will and bequeath all my estate to his eldest grandchild living at my death. I appoint as my executor with seisin and without bond my friend J. A. Woodville."

The will of December, 1915, reads as follows:

"My name is Salvatore Pizzati. I have been married but once, and then to Francesca Valenzano, who is still living. I desire my adopted son, M. A. Pizzati, to collate twenty thousand

dollars ($20,000.00), which I have given him in cash. I will and bequeath to my good friend Robt. Woodville, of Utilla, S. H., whom I have known for over forty years, the disposable portion of my estate. Should he die before me I will and bequeath to his grandchild, Dorothy Helen Woodville, the disposable portion of my estate. I appoint as my executor with seisin and without bond my good friend John Alonzo Woodville and I desire that all of the transactions I have had with him and which are in writing and signed by me be carried out as agreed upon in his behalf."

It will be noted that none of these wills contains a revoking clause except the first. Hence one of the questions in the case is as to whether the money donations of the several prior wills are revoked by the posterior wills.

The case comes up on oppositions to the final account of the testamentary executor. After payment of the debts, he, in this account, gives to the surviving wife one half of the estate, and to Robert Woodville, beneficiary under the will last in date, the other half; this on the theory that the money legacies in the prior wills were revoked by the posterior wills, and on the further theory that the adoption of the son was a nullity, and that a certain agreement, to be hereinafter considered, which was entered into by the widow and Robert Woodville, the beneficiary under the will last in date with this adopted son, was also a nullity.

The account shows $90,685.15 of assets, as per estimation of inventory and as per cash in bank, all community property, and $19,-755.78 of debts, including all expenses of administration.

The oppositions to the account are numerous.

The particular legatees under the prior wills contend that their legacies were not revoked by the wills subsequent in date.

Article 1691, C. C.:

"The revocation of testaments by the act of the testator is express or tacit, general or particular. It is express when the testator has formally declared in writing that he revokes his testament, or that he revokes such a legacy or a particular disposition.

"It is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will.

"It is general when all the dispositions of a testament are revoked.

"It is particular when it falls on some of the dispositions only, without touching the rest."

Article 1693, C. C.:

"Posterior testaments, which do not, in an express manner, revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or entirely different."

The first case in which these articles came before this court for interpretation is Sarce v. Dunoyer's Ex'r, 11 La. 220. In that case the testator had made particular legacies and named a universal legatee in a first will, and had in a second will again made other particular legacies, and named a universal legatee. Whether the particular legacies in the second will were to the same persons as in the first the report of the case does not show; but a different person was named universal legatee. Whether, as in the instant case, the testator stated in the second will that he intended it to be his last will and testament also does not appear by the report of the case. The court held that the particular legacies of the first will had not been revoked. The court reasoned as follows:

"When it is considered that the universal legatee is bound to discharge the particular legacies, and is in fact entitled only to the residuum after the payment of legacies and debts, the apparent inconsistency vanishes. The opinion of Duranton is the other way, but the reasoning of that learned professor is not satisfactory to our minds. His argument seems to lose sight of the essential quality of a universal legacy, to wit, the obligation on the part of the legatee to comply with the wishes of the testator as it relates to particular legacies; and we do not see how, according to his argument, the particular legacies contained in the same testament would be compatible with the institution of a universal legatee; for he who gives all to one has nothing left to bestow on others. The mere substitution of Cazeaux in the place of the manumitted slaves of the testator as residuary legatee, and of Pilie as executor, does not in a legal sense evince a change of will, as it relates to his nephews and nieces. We are sensible that to the great mass of the citizens it will appear absurd that a man can leave two last wills in force. But we are to ascertain the probable intentions of testators, not by reference to the common received notions on these subjects, but according to the provisions of law, and must presume, however gross the fiction, that the testator knew the law, and even its subtleties, as well as, if not better than, a professor of the faculty of Paris.

"Our view of the question is fortified by repeated decisions in France under a similar provision in the Code Napoléon. Several of the royal courts concur in causes identically the same with this, in adopting the principles which we assume as the basis of our judgment. These are the highest courts which, according to the peculiar judicial organization in that country, could take cognizance of such a question, inasmuch as the Court of Cassation never receives the judgments of the inferior tribunals upon the merits of the controversy, as between the parties, any further than the judgment complained of violates any textual provision of the Codes. Merlin, verbo Cassation, § 2; 9 Sirey, 2 partie, 255; 28 Sirey, 2 partie, 188; 31 Sirey, 2 partie, 306."

This reasoning is not satisfactory.

[1, 2] First, as to the proposition that the testator must be presumed to have known the law "as well as, if not better than, a professor of the faculty of Paris": That the court makes here a false application of a familiar principle can be easily demonstrated. Everybody is agreed that the question of implied revocation is one purely of intention; in other words, that the incompatibility, or contrariety, which article 1693, C. C., speaks of need not be physical or legal, but intentional only. Now, when it comes to theorizing as to what a man's intentions were when he did a certain thing, we have to take the man and his surroundings as they were, or, in other words, take the facts as they were. We cannot assume the existence of a fact which we know did not exist, and proceed to judge from that fact. We should thereby be simply leading ourselves into error voluntarily. We must judge from the facts, the real facts. If the testator was, as a matter of fact, not versed in any particular science, be that science medicine, engineering, law, or any other, we cannot assume that he was a master of that science, and proceed to base our deductions on that false assumption. That the question of what

was the intention of the testator is one of fact, not even of mixed law and fact, but of fact purely, is a plain proposition, one in support of which, if need were, a long list of decisions of the Court of Cassation of France could be adduced, rendered in cases involving the implied revocation of wills, of which that court has uniformly refused to entertain jurisdiction because the question was one purely of fact, and not in any respect of law. The presumption of every man knowing the law has been adopted as a matter of policy in the relations of the individual with society, from convenience or necessity, and not because true; on the contrary, it is known positively to be false. If we adopt it as a fact and judge from it, instead of from the real facts, we simply do the unreasonable thing of judging from what the court in this Sarce-Dunoyer decision qualifies as a "gross fiction," instead of judging from the facts.

[3] So much for that. Now as to a particular legacy not being inconsistent with, or contrary to, a universal legacy: To say that it is not is to say that the whole of a thing may be given to one person and at the same time a part of it to another—a patent absurdity. True, the Civil Code (article 1611) provides that the universal legatee "is bound to discharge all the [special] legacies"; but the framers of the Code did not mean by this to imply that the legacy of a part is not inconsistent with a legacy of the whole, for it manifestly, patently, is. But while such two legacies are thus inconsistent in fact, they need not necessarily be so in intention; and since it is the intention that governs, and since every testator manifestly intends that his will shall be carried out as he has made it, and since the nearest that this can come to be done when in the same will a part is given to one person and the whole to another is to assign the part to one and the remainder to the other,

the law has made this special provision requiring this to be done. But the basis, the reason, of this is as just stated, namely, that when a testator sits down to make his last will and testament and makes it, he must be assumed to have intended that the will should be carried out as he has made it, in all its parts, and the nearest that this can come to be done is to assign a part to one and the remainder to another. This interpretation is adopted, not because there is no inconsistency between the giving of a part to one person and the whole to another, for manifestly there is, but simply from dire necessity, as being the best approximation that can be made in the matter. This, however, is true only where the two dispositions thus absolutely inconsistent are contained in one and the same will; it is manifestly not true when the two dispositions are contained in two wills of different dates. The two wills are then inconsistent, and the later in date it would seem ought to prevail.

Some of the French courts and some of the commentators on the Code Napoléon have refused to recognize this inconsistency. One reason given by them for this conclusion in the matter is stated as follows:

"It is to be supposed that the testator has made this subsequent universal legacy not with any intention of revoking the legacies contained in the prior will, but in order to secure to this universal legatee the benefit of any eventual rights of accretion that would result from the lapsing of any of these prior legacies." Aubry and Rau, vol. 7, p. 578, note 24, par. 725, Des Succession Testamentaires.

Laurent, vol. 14, Donations and Testaments, p. 235, No. 212, answers:

"If we could put to the testator this question: Was it in order to assure to your universal legatee the right of accretion that you instituted him your universal legatee? What would he answer? He would say: I do not understand what you mean by the right of accretion. My intention was to give all my property to my universal legatee; that is why I named him my universal legatee. What do you mean by preceding legacies that may lapse? These preceding legacies no longer exist, since I have disposed

of all my property by a testament which is the expression of my last will. All I know is that I had the right to change my mind in regard to what disposition I should choose to make of my property by will, and that I did so by this last will of mine."

Another reason given, see Aubry and Rau, loc. cit., is as follows:

"The universal legacy has for its object, not the property of the testator considered in itself, but his patrimony; that is to say, a universality of property distinct from the particular things composing it."

Laurent, loc. cit., says:

"This argumentation is excellent, but in order that it should have any meaning, it must be placed in the mouth of a jurisconsult. Can you imagine a woman knowing the difference between her property and her patrimony? When she leaves all her property, she intends that the legatee take all the property she leaves at her death. To interpret wills as if they were written by Dumoulin or Pothier is to lead to consequences which common sense cannot accept. And the law would do well not to clash too much with common sense."

The matter being one purely of fact and common sense, Laurent and those who side with him would appear to have decidedly the best of the argument. However, the majority of the courts of appeal of France (not the Court of Cassation, however, since that court has no jurisdiction in the premises, the question being one of fact) have pronounced the other way; and so has this court in this Sarce-Dunoyer Case and in the cases of Lyon v. Fisk, 1 La. Ann. 456, City v. Fisk, 2 La. Ann. 78, and Tournoir v. Tournoir, 12 La. 19.

In this Tournoir Case the court gave no reasons, but simply held that the special legacies of a first will were not revoked by the naming of a universal legatee in a second will.

The two Fisk Cases involved the same will. They are of no weight in the present discussion, for the reason that they are founded in part on the fact that the testator had orally directed both wills to be carried out, and in part upon a provision of the Spanish law to the effect that "where two wills have been made the legacies contained in both shall remain valid," and for the further reason that the court expressly stated that by reason of this provision of the Spanish law (held to be still in force) "the ascertainment of the intention of the testator is not necessary to the decision of this case"; whereas in the case now at bar the ascertainment of the intention of the testator is admittedly the whole case.

In Succession of Mercer, 28 La. Ann. 564, a second will not containing a revocatory clause gave a sum of money to a legatee to whom a like sum had been given in a first will, and gave to another legatee a sum less than had been given him in the first will. The court held that the legacies of the second will were not to be added to those of the first will, but to supplant them.

In Succession of Bobb, 42 La. Ann. 40, 7 South. 60, a subsequent will which had not disposed of the entire estate and which contained no revoking clause was held to have revoked a former will in which a universal legatee had been named. The reason given was that from the second will's "tenor as compared with the previous wills it appeared clearly to have been intended by the testatrix to have been made in lieu" of the prior wills.

Here from the reading of the second will the court deduced an intention to revoke the first; this on the principle that the whole question is simply one of intention; and we dare say it will seldom happen that the testament itself will not furnish some indication of what was the testator's intention, either by some expression to be found in it, or by what would be the result if both wills were given effect.

[4] Whether the mere naming of a universal legatee in general terms and without a revoking clause will in any case be considered to have tacitly revoked special legacies contained in a former testament is a question upon which, as just stated, the courts and law writers of France differ. That ques-

tion does not arise in the present case; for in the present case the testator has not in the will latest in date merely in general terms instituted a universal legatee, but has in plain language made a disposition entirely inconsistent with the legacies contained in the former wills. His language is:

"I give the disposable portion of my estate."

And in the will of October, 1911, later in date than the will containing the special legacies, he had said:

"I give all the disposable portion of my estate, real, personal and mixed."

If instead of resorting to legal refinements, out of place in such a case, for ascertaining what was the intention of the testator, we accept that intention as here plainly expressed, we avoid all difficulty. Where a testator merely says, "I constitute such a one my universal legatee," there may be room for contending that he intended the person there named to take only after the discharge of all the legacies, for that is how a universal legatee takes; but where he says, "I give all the property I may die possessed of to such a one," we do not see how there can be room for contending that he did not mean what he so plainly expressed. And we hold that in the present case he so intended.

And that conclusion is fortified by the circumstances of the case.

In the first place, each of the wills carries a complete disposition of the entire estate, and contains recitals which would have been entirely superfluous in a will intended to be merely additional, supplementary to, or designed to be read in connection with, another, and not to stand independently by itself as the sole and only will. We refer to the clause wherein the testator gives information about himself.

In the second place, all the special legacies stand upon precisely the same footing, when we come to consider whether they have been revoked or not; all have been revoked, or else none; and, if none, then they more than absorb the entire estate, and the will last in date is nullified; the wills of earlier date have precedence over it. What greater inconsistency, or contrariety, or difference than this there can be between two wills, outside of an express revocation, it would be hard to imagine. The conclusion that a universal legacy does not revoke special legacies in a prior will is qualified even by Aubry and Rau, ubi cit., by the addition "unless, indeed, these previous special legacies would absorb the entire succession."

The learned counsel for the special legatees call attention to the express revocation contained in the first will as showing that the testator was aware of the necessity of revoking prior wills if he desired to nullify them, and as giving rise, therefore, to an inference that his not inserting this clause in the subsequent wills was because of his having intended that they should stand.

No doubt, a good deal of significance must be attached to this circumstance; but whatever force it may have is manifestly overcome by the other circumstances of the case.

The adopted son, Marco Antonio Pizzati, filed an opposition claiming to be entitled to one-half of one-half of the estate by virtue of his adoption, confirmed by an agreement entered into by him and the surviving widow and the universal legatee, Robert Woodville, as follows:

"It is mutually agreed by and between (1) Mrs. Frances Valenzano Pizzati, (2) Marco Pizzati, (3) Robert Woodville, of Utilla, S. Honduras, herein represented by his agent and attorney in fact, J. L. Warren Woodville, that the last will and testament of the late Salvatore Pizzati, executed on December 7, 1915, will be registered, probated, and executed in accordance with the terms, except that Marco Antonio Pizzati will not be called upon to collate the twenty thousand dollars ($20,000.00) as detailed in said will, it being understood and agreed among all parties as though that clause of the will was not written, considering there was a consideration for said twenty thousand dollars ($20,000.00)

which absolves the said Marco Antonio Pizzati from collating same.

"That the universal legatee, Robert Woodville, will receive one-quarter of the net value of the estate, one-fourth of the net value of the estate to Marco Antonio Pizzati, and the widow, Mrs. Frances Valenzano Pizzati, will receive the one-half of the net value of the estate; it being understood that the one-half received by Mrs. Frances Valenzano Pizzati is her community interest in the estate, which is entirely community. In all other respects the said will is to be carried out as written."

[5, 6] The account of the executor, as already stated, ignores the adoption as well as this agreement, and gives one-half of the estate to the widow and one-half to Robert Woodville as residuary legatee; this on the theory that the adoption is null because it was made by act before a notary public, instead of by judgment of court, and that the agreement is null because it was without consideration and was made in error as to the quality of the opponent, he having been supposed to have been adopted when in point of fact he had not.

The adopted son contends that the executor, in filing his account, had no right to ignore the adoption and the said agreement; that his legal duty was to carry out the will which recognizes the adoption; that, at all events, the validity of the adoption and of the agreement cannot be inquired into in this proceeding, since there are no pleadings setting up those issues; that the executor and the residuary legatee, holding under the will, are without standing for contesting the validity of the adoption; that another reason why the residuary legatee is without standing in the premises is that he is without pecuniary interest, since, not to him, but to the heir at law, would inure the share of the adopted son in the estate should the adoption be set aside; that the said agreement was a valid compromise, and a ratification of the adoption, and, even if invalid, could not be thus ignored, but had to be recognized and given effect to until set aside in a direct action; and, finally, that the executor and the widow are estopped from contesting either the adoption or the said agreement, because they joined with the adopted son in the petition presented to the court for the probate of the will, and there recognized and affirmed the adoption.

We think the course followed by the executor in ignoring the adoption and the agreement in his account was proper.

He was no party to the agreement, and therefore not bound by it. If its validity was being contested for reasons which appeared to be good, he was not obliged to recognize it in his account, but could ignore it, as he did, and let the parties in interest set it up in opposition to his account, as has been done, and let the question of its validity be contested in that manner.

In like manner, if he became advised that there was no adoption, and that in the absence of an adoption the one-half of the estate had to go to the residuary legatee, his duty was to frame his account accordingly. This course was followed in Succession of Dupre, 116 La. 1090, 41 South. 324, and no objection was made to it. In that case the question of the validity of the adoption came up on an opposition to the account as in the instant case.

[7] The allegations made in the oppositions as to the adoption and the said agreement, being valid and binding, are open to every objection of law or fact as if such objections had been specially pleaded. That this is the case with the allegations contained in an answer to a petition is hornbook law. Hennen Dig. p. 1155, No. 1. And it is well settled that the oppositions to an executor's account are in the nature of answers; stand as such. Succession of Planchet, 29 La. Ann. 520; Succession of Dougart, 30 La. Ann. 270; Succession of Ames, 33 La. Ann. 1325.

[8] The executor, in defending his account, represents whoever will be entitled to take the share of the adopted son in the estate should the adoption be set aside. It may

be the residuary legatee, or it may be the heir at law; but that is a matter in which the adopted son has no concern. The question is one between the heir at law and the widow, and she has not prayed in her opposition that the account be amended so as to give this share to her.

[9, 10] We have, then, to consider the question of the validity of the adoption and of the said agreement.

Marco Antonio Pizzati, the adopted son, was a major at the date of the adoption, and the adoption was by notarial act, not by judicial proceedings.

Civil Code, art. 214, authorizes the adoption of majors, but makes no provision for any form of proceedings for effecting an adoption; and no provision therefor is to be found in our law, unless it be section 2328 of the Revised Statutes, or Act 64, p. 77, of 1868, from which the said section was taken by the revisers of the statutes. These require that the adoption be effected by means of judicial proceedings. Counsel for the adopted son contend that the said act of 1868 was repealed by the repealing clause of the Revised Statutes, and that the said section of the Revised Statutes has no application to the adoption of majors. On the other side the contention is that the said section of the Revised Statutes does have application to majors.

That part of the title of the Revised Statutes which pertains to this section 2328 reads, "An act relative to the adoption of minors and the form of proceedings;" and this section 2328 is found in the Revised Statutes in the chapter headed "Minors," and in this chapter it is found under the subhead "Adoption of Minors." The section is taken verbatim from the said act of 1868, which had reference to the adoption of both majors and minors, and it contains the clause "when the person whose adoption is solicited is a minor."

It is in view of this clause that the contention is made that the section has application to majors as well as to minors. While the contention that it has application only to minors is based on the fact that the place in which it is found in the Revised Statutes, and the rubrics under which it is found, and the title under which it was adopted, all indicate that it has application only to minors.

The latter view impresses us as being correct. Not entirely because of the reasons here given, but for the paramount reason that, as applicable to majors, the section would be null because violative of the constitutional provision which requires the object of every act to be expressed in its title. Legislation on the subject of majors would not be responsive to a title relative to minors.

[11] However, for that same reason, we do not agree with the contention that the act of 1868 from which that section was taken has been repealed in so far as majors are concerned. The repealing clause of the Revised Statutes repeals all laws in conflict or on the same subject-matter. A law relative to the adoption of minors is not on the same subject-matter as a law relative to the adoption of majors. A law entitled an act relative to adoption (i. e., adoption in general) would be on the subject-matter of the adoption of majors, even though it contained provisions relative only to minors. But an act "relative to the adoption of minors," while having adoption for its subject-matter, has not the adoption of majors for its subject-matter. The qualifying phrase "of minors" has the effect of converting the word "adoption" from a general term, including the adoption of majors within its meaning, to a specific term, not including the adoption of majors within its meaning. In the same way, while an act relative to the prevention of fires would be on the subject-matter of fires in rural districts as well as in cities, an act relative to the prevention of fires in cities

would not be on the same subject-matter as an act relative to the prevention of fires in rural districts. A clause in one of the acts so entitled repealing all laws on the same subject-matter would not have the effect of repealing the other of these acts.

In the decisions under the revisory legislation of 1855, State v. Fuller, 14 La. Ann. 667, and other cases, it was held that previous statutes creating crimes were not repealed by the repealing clause of the revision repealing all laws in conflict and on the same subject-matter. Those cases were distinguished in State ex rel. Jarvo v. Judge, 37 La. Ann. 578, which involved the repealing clause of the revision of 1870, the Revised Statutes. In this Jarvo Case the court laid stress upon the fact that the titles of the acts of revision were in sweeping terms, to wit, "An act relative to crimes and offenses," and "An act relative to criminal proceedings"; and very properly said that these acts were necessarily on the same subject-matter as prior acts relative to crimes and criminal proceedings, and laid stress also on the fact that the repealing clause of the Revised Statutes of 1870 made express exception of the act of 1805 entitled "An act for the punishment of crimes and misdemeanors," thereby clearly indicating that all previous legislation on the subject of crimes was repealed except the act thus expressly excepted.

What was said in Succession of Dupre, 116 La. 1091, 41 South. 324, has reference evidently only to the adoption of minors. It will be noted that the act of 1872 there involved does not contain a repealing clause.

Very true in this Jarvo Case the court says that "it was the intention of the Legislature to authorize not merely a compilation or digest of the laws of the state, but to adopt a body of laws under the general head of 'Revised Statutes;'" and one might infer from this that the court meant to convey the idea that all previous statutes were repealed even though not in conflict nor on the same subject-matter; but the court meant nothing of that kind, as is evident from what follows in the opinion, and could not have meant it, as the repealing clause would have had to be worded differently in order to convey that meaning. Evidently, if the Legislature had intended to repeal by the Revised Statutes all previous legislation, whether on the same subject-matter or not, it would have been easy to say so. But it would have been most dangerous. For many a statute might then have been found to have been repealed which there had never been any intention to repeal; and the state would soon have awakened to the fact that it was without necessary legislation upon many points.

And we think this matter of the mode of adoption of majors would have been one of them. There would have been legislation authorizing the adoption of both majors and minors, and there would have been legislation providing a mode of adoption for minors, but none for majors. Why the revisers would have thus concluded to leave the state without any provision whatever as to the mode of adopting majors it would have been hard for any one to explain. The fact is that they did not, but that the act of 1868 prescribing the mode of adoption for majors was not repealed, but continued in full force and effect.

[12] However, if such were not the case, and said act were repealed, what then?

Article 214 of the Civil Code says, "Any person may adopt another," etc.; i. e., may adopt a major as well as a minor. But it makes no provision for the mode of proceeding for the adoption of a major, nor is such mode provided for anywhere else in our legislation, except in said act 1868 and in the acts which it amends.

In this condition of things the learned counsel for the adopted son argue that, inasmuch as the adoption of majors is authorized, and no special mode is prescribed for effect-

ing it, it may be by notarial act; and the learned counsel proceed to suggest reasons why that mode is the most eligible one. They argue as if adoption were a contract between the adoptant and the adoptee.

Adoption is not a contract, and is not of natural law at all. The breath of the Legislature creates it out of nothing. It is wholly and entirely artificial; it is precisely and exactly what the Legislature makes it. The particular adoption which article 214 has reference to is declared by that article itself to have the effect of investing the adoptee with "all the rights of a legitimate child in the estate" of the adoptant, except that it "shall not interfere with the rights of forced heirs." So that it makes an heir of a person who is not such; disturbs the order of succession except as to forced heirs. Such being the case, the parties to it are not the sole parties in interest, but all the legal heirs who are to be displaced by it have an interest; and, as the matter involves the status of heirs, society itself has an interest. This status, once established, is entitled to recognition, or, in other words, to have full effect, in all countries where adoption is allowed. Succession of Caldwell, 114 La. 195, 38 South. 140, 108 Am. St. Rep. 341. It is not a thing of gradual growth, but springs into full, final, irrevocable existence the moment the ceremonial which is to bring it about has been gone through with, whatever that ceremonial may be.

The legal status is a result of the adoption; it is not the adoption itself, for the adoption is the act, the outward manifestation or ceremonial, by which it is brought about. A statute which authorizes the result to be brought about, but does not provide the means of bringing that result about, or, in other words, authorizes adoption without providing the means of effecting it, is defective, and can have no operation. Such a statute is in the same condition as those constitutional provisions which, for the same reason of not having provided the means of being carried in effect, are held not to be self-operative. For instance, article 132 of the Constitution of 1868, reading, "All lands sold in pursuance of decrees of courts shall be divided into tracts of from ten to fifty acres," was held not to be self-operative. Bowie v. Lott, 24 La. Ann. 214; Morrison v. Flournoy, 25 La. Ann. 546; Bohn v. Bossier, 29 La. Ann. 144; Greig v. Eastin, 30 La. Ann. 1130; City of New Orleans v. Wood & Bro., 34 La. Ann. 735. And article 192 of the Constitution (1879) reading, "Parochial and the municipal elections in the cities of New Orleans and Shreveport shall be held on the same day as the general state election, and not oftener than once in four years," was held not to be self-operative. State ex rel. v. Patton, 32 La. Ann. 1200. We dare say provisions of this kind, not self-operative, may be found in every Constitution.

[13] The Legislature not having furnished the means of effecting the adoption of a major, the courts, of course, cannot do so. It would be legislating. If the adoption is to be effected, therefore, this status of legitimate child created, it will have to be by some means to be devised by the adoptant himself; and, since no legislative provision will interfere with his freedom of action in the matter, he will be at perfect liberty to suit himself. Whatever particular mode of adoption may happen to strike his fancy, he will be at perfect liberty to choose. There being none prescribed by law, the courts would have absolutely nothing to stand upon for holding that the particular mode chosen was not the right one. They could point to no law which authorized them to require that some mode of adoption heretofore used somewhere, at some time in the history of the world, by some nation or tribe, should be followed. And if they did require that one of these former modes should be followed, these modes are

so different and numerous that the would-be adoptant would still have a wide variety to choose from.

Learned counsel say that the mode by notarial act is a good mode. Doubtless it is; and so are, or were, the other various modes practiced among different peoples at different times in the history of the world. These other modes would not have been used if they had not been thought to be good; nay, if they had not been thought to be the very best. Counsel are positive that this mode by notarial act which they are holding to be good is good; but they have no better legal ground to stand on for saying so than some other party who had chosen some other mode (no matter how fantastic) would have for saying that this other mode was good. The law alone can fix this mode; the courts cannot do so, nor can the parties.

Adoption not having any existence independently of the legislative will expressed in some statute, it must necessarily be dependent upon some statute not only for the result, or effects, of it, but also for the manner of it. It is entirely, from the first to last, of artificial creation. Such being the case, the statute must needs prescribe not only the effects, or result, but also the act, or ceremonial, which will bring about the result.

Very true a notarial act shows an intention to adopt, but adoption cannot result from the mere manifestation of an intention to adopt, or from the mere combined manifestation of an intention to adopt and to be adopted. If it could, the legal situation would be that any manifestation which would be sufficient for showing such an intention would secure the purpose of effecting an adoption. An oral declaration of adoption in the presence of reliable witnesses would be as efficacious, as much entitled to recognition, as one by writing, by notarial act, or by judicial proceeding. Neither having the sanction of positive law, but depending both of them for recognition upon their mere aptness for making proof of the manifestation of an intention to adopt and to be adopted, neither could claim legal precedence over the other; both would stand upon precisely the same legal footing. Adoption vel non would then depend upon the mere sufficiency of evidence, and would be susceptible of proof like any other fact en pais. Circumstantial evidence would be just as good and effective as a private writing or the direct testimony of witnesses. The courts can sanction no such result as this; and yet it is the necessary and inevitable consequence of allowing adoption to be effected in any other mode than in some mode prescribed by law.

[14] The maxim that where there is a right there is a remedy does not apply to such a case as this. This maxim means nothing more than that whatever may be due to one may be demanded judicially in some form or other; or, in other words, that the courts are open for the vindication of all rights no matter what they may be.

[15] Nor can the maxim that when anything is granted that also is granted without which the thing granted could not exist help the situation in any degree; for after we have applied it we are still confronted with uncertainty as to what thing has been granted. The right to adopt has been granted; and the right to adopt is the right to endow some one with the status of a legitimate child; but how, by what means, is this to be done? The answer must be, by any means which the parties may choose to adopt, if it is to be done at all; for the law does not prescribe any particular means, and the courts are powerless to do so, as it would be legislation.

[16] The maxim applicable is rather, "ubi jus incertum, ibi jus nullum;" where the law is uncertain, there is no law. When article 214 says that "any person may adopt another," it says that any person may do an

act which when done will have the effect of immediately and irrevocably creating the status of legitimate child for the adoptee, thereby immediately and irrevocably disturbing the order of successions among the legal heirs outside of the forced heirs. But it does not say what this act shall be which shall operate this immediate, important, and irrevocable change. And when we put to our legislation the question, "What shall this act consist of?" we get no answer. We are met by a Sphynx-like silence. We know, of course, that it is to be an act of adoption, but when we come to inquire what an act of adoption consists of, we find that it must necessarily consist of what the law expressly provides it shall consist of, or else of whatever form or ceremony the fancy of the parties to the adoption may lead them to choose for serving as an outward demonstration of their intention to effectuate an adoption, and that we would have absolutely nothing to stand on in law for saying that one form of adoption was better than another, so long as it could serve as an outward demonstration of the intention of the parties by being susceptible of proof in court under the ordinary rules of evidence.

Unless we are prepared to hold that adoption may be effected in any mode which the fancy of the parties may dictate (no matter how fantastic), we have to conclude that it can be effected only in some mode expressly provided by law; and this last is our conclusion.

The adoption, not having been in the form prescribed by law, is null.

[17] And the agreement hereinabove transcribed is equally null; for it was entered into in the belief that there had been an adoption, when, in point of fact, there had been none; such a thing as adoption by notarial act not being legally possible. Article 1838, C. C., provides for just such a case. It reads:

"Error as to quality or character in which the party acts, as well as a mistake as to the person himself, invalidates a contract, when such a quality or character is the principal cause of the agreement: Thus, a compromise with one, who is supposed to be the heir of a deceased creditor of the party contracting, is void, if he be not really the heir."

[18] And by said agreement no consideration moved from Marco Antonio Pizzati to the widow or to the residuary legatee. The two latter agreed to renounce or waive that clause of the will which required him to collate the $20,000, but he neither gave nor relinquished anything.

The agreement, being null, cannot serve as a basis for estoppel.

As to the petition filed jointly for the probate of the will, the residuary legatee was no party to it; and if he had been a party, and if the allegations there made had been of a nature to estop him, the same error which releases him from the said agreement would have released him from the estoppel resulting from the judicial allegations thus made; for the allegations would have been prompted by the same error.

The will does not purpose to bequeath the reserved portion of the adopted son; it merely mentions the fact of the adoption. An analogous case is that of Succession of Serres, 136 La. 531, 67 South. 356, where the recital in the will of the fact that the legatee was the legitimate child of the testator was not equivalent to, and did not have the effect of operating, a legitimation.

In that connection a notarial act executed by the decedent in January, 1911, is noteworthy. In it he declares that he "repudiates, cancels, and annuls" the adoption, and gives his reasons for so doing.

[19] It is said that the agreement was a recognitive and confirmative act, and that therefore the parties to it renounced whatever right they might have had to attack the adoption. The agreement contains no such declaration; and it is utterly destitute of the essential requirements of a recognitive and confirmative act, one of which is that such an

act must contain an express mention of the grounds of nullity intended to be waived, as well as an express waiver of them. C. C. 2272. In the case of Nolan v. New, 31 La. Ann. 553, the legacy there in question had been delivered to the legatee with the consent of the complainant, and the complaint was being urged several years later, and after the death of the legatee. In the language of article 2272, supra, "it is sufficient that the obligation be voluntarily executed," etc.

The collation of the $20,000 discussed in the briefs is not involved in this case; the matter involved being simply the approval of the account of the executor.

### Opposition of Horace H. Newman.

On April 18, 1914, the decedent made a written contract with Newman by which he sold to him 120 shares of stock at $195 per share, less a deduction of $1 per share, representing the usual commission of brokers for selling stock, which expense Pizzati was being saved by selling to Newman, who was himself a broker.

There was then due and uncollected a dividend of $1 per share. The agreement was that this dividend should go to Newman.

Pizzati, instead of delivering the stock to Newman, sold it to some one else. Newman fixes as of April 24, 1914, the date at which he became informed of the breach of the contract. At that date and thereafter the market price of the stock was $200 per share; and Newman claims as damages the difference between $193, which he would have had to pay under the contract, and $200, which a like amount of stock would have cost him on the market.

He is clearly entitled to judgment if he did not become informed of the breach of the contract before said date; but the opposite contention is that he had this information in the evening of the 18th, which was a Saturday, and that on the following Monday, the 20th, the market price of said stock had fallen to $193 bid, and none offered, and on the 21st, morning, to $192 bid and offered at $194, and that, inasmuch as he could have bought a like amount of the same stock at the same, if not a lower, price, he suffered no damage.

The evidence leaves doubtful when Newman became advised of the breach of the contract. We think it is best to leave the case open for positive and definite evidence to be produced on that point.

### Opposition of Dr. T. R. Rudolph.

[20] Dr. Rudolph is a practicing physician, and also teaches the class of chemistry in the Boys' High School from 9 a. m. to 2 :30 p. m., for which he is paid $165 a month. He says that between the 2d of November, when the decedent first consulted him professionally, and the 30th of December, when the decedent died, he "saw" the decedent "I suppose altogether about 160 times" professionally. Ten of these times were prior to the 8th of December, and were at his (witness') office, except the first, and the treatment was for dysentery. The visits from the 8th to the 11th of December, inclusive, when the decedent was still going about, were at the house of the decedent, and were for a cold. This cold developed into pneumonia on the the 12th or 13th, and the treatment until the 22d, inclusive, was for pneumonia. By that time the patient had recovered from the pneumonia. On the 25th the kidneys ceased functioning, and he fell into a stupor from uræmic poisoning, and this continued until his death in the night of the 30th. On the 30th he was evidently beyond treatment, and on the 29th almost so. Opponent presented a bill for $5,000. The executor allowed $250. The trial judge allowed $500. Two physicians and the opponent himself have testified that the charge is reasonable.

Opponent is not shown to be one of the au-

tocrats of the profession whose ministrations are worth whatever estimate they may choose to put upon them, but to be a physician who supplements his medical work by devoting the better part of each day to the daily routine of a boys' high school. The visits to his office were such as, the evidence shows, $2 are ordinarily charged for, and the services at the house were in the treatment of a common case of pneumonia, except during the few days intervening between the 22d and the 28th, when nothing extraordinary in the way of medical skill seems to have been either called for or displayed. The decedent also suffered from leakage of one of the valves of the heart; but this did not enter into the treatment, and cannot figure in the bill. The allowance of $250 in the account was, we think, entirely reasonable.

#### Opposition to Claim of Woodville & Woodville.

The law firm of Woodville & Woodville, composed of the executor, J. A. Woodville, and of the attorney of the executor, J. L. Warren Woodville, brothers, is put down in the account for $10,000, because of the following document:

"I admit owing J. A. Woodville ten thousand dollars according to my agreement with him for all the time and attention he has devoted to me. New Orleans, Sept. 24, 1915.

"[Signed] Colonel S. Pizzati.
"Witnesses:
"A. Fisher.
"J. L. Warren Woodville."

The attack upon this document has failed completely. There can be no serious question that it was executed by the decedent while in the possession of all his faculties, and for the purpose of serving for what it purports to be, the free acknowledgment of an indebtedness in the amount specified. Valuable and long-protracted services are shown to have been rendered, in remuneration of which the document was executed. Whether they were really worth that much is a ques-

tion which the decedent could and did decide for himself; and with which therefore the courts have no concern.

While the document is in favor of J. A. Woodville alone, the evidence shows that the brothers and law partners had an express understanding that whatever services were being rendered to Salvatore Pizzati were for and by the firm, inasmuch as those not of a professional character took up time that was due to the firm.

#### Funeral Bill, $503.75.

[21] This expense was incurred after the community of acquêts and gains had been dissolved by the death of the husband, and should therefore be charged, not to the community, but to the husband's half of the community property.

#### Fee of J. L. Warren Woodville, $4,000.

[22] This fee is allowed J. L. Warren Woodville for his services as the attorney of the executor for the settlement of the succession. It is opposed on the grounds: First, that the executor, being a lawyer, should attend in person to the law business of the estate, and has not the right to employ an attorney to do so; and, second, that the fee is excessive.

This first point may be considered to have been finally settled by the decision of this court in the case of Succession of Richards, 49 La. Ann. 1115, 22 South. 317, citing Fenner v. McCan, 49 La. Ann. 600, 21 South. 768. In Succession of Hutchinson, 112 La. 656, 36 South. 639, large fees were allowed to the attorney of the executors, who were themselves lawyers. The evidence shows that no part of this fee is to inure to the executor.

The amount of the fee is reasonable.

#### Robert Woodville, Reputed Interposed.

Something is said in one of the briefs about Robert Woodville, the legatee, being a

person interposed for J. A. Woodville, the executor; but that point is not raised in the pleadings, and therefore need not be considered.

The judgment appealed from is amended by reducing to $250 the amount allowed to Dr. T. R. Rudolph, and it is set aside in so far as it recognizes Marco Antonio Pizzati as the adopted son of the decedent, and orders one-fourth of the net estate to be delivered to him, and in so far also as it rejects the claim of H. H. Newman, and it is otherwise affirmed. The case is remanded for further evidence on the opposition of H. H. Newman; the costs of the appeal to be paid jointly by the appellants Dr. Rudolph, Marco Pizzati, Audubon Park Association, Kingsley House Association, Société des Dames Hospitalieres, St. Alphonsus Convent of Mercy, Society of St. Vincent de Paul, Association Relief Jewish Widows and Orphans, New Orleans City Park Improvement Association, Eye, Ear, Nose and Throat Hospital, succession of Samuel Henderson, and the succession of Salvatore Pizzati, or each one-twelfth thereof; the costs of the trial court to be paid by the succession, except those specially incident to the several oppositions which either by the judgment appealed from or by the present judgment have been rejected, which are to be paid severally by each of the said opponents as incident to his opposition.

MONROE, C. J., takes no part.

See concurring opinion of LAND, J., 75 South. 510.

On Applications for Rehearing.

PER CURIAM. It is hereby ordered that all the petitions for rehearing filed in this cause be refused, except the following, which are hereby granted, to the extent indicated below:

The opposition of Mrs. Pizzati, in so far as it is based on the provisions of the wills, and her rights if any, as heir of the deceased.

The opposition of Marco Pizzati, in so far as it is based on the provisions of the wills, and the compromise agreement of the parties filed in evidence, and also the opposition of Dr. Rudolph.

On Rehearing.

MONROE, C. J. A rehearing was granted in this case upon the opposition and in the terms following, to wit:

"The opposition of Mrs. Pizzati, in so far as it is based on the provisions of the wills and her rights, if any, as heir of the deceased; the opposition of Marco Pizzati, in so far as it is based on the provisions of the wills, and the compromise agreement of the parties, filed in evidence; and also the opposition of Dr. Rudolph."

No rehearing was granted upon the question of the validity of the alleged adoption of Marco Pizzati, and the judgment as handed down is final upon that question.

Upon a re-examination of the oppositions filed by Mrs. Pizzati and Marco Pizzati, we find that neither of them claimed anything under the provisions of the wills, those claims having been set up, for the first time, by Mrs. Pizzati in her application for rehearing, and by Marco Pizzati in the brief filed in support of his application for rehearing. But, if it were otherwise, the result would be the same. Mrs. Pizzati rests her claim upon the theory that the testator, having, by his latest will, bequeathed only the disposable portion of his estate to Woodville, died intestate as to that portion which would have constituted the légitime of Marco Pizzati if he had been legally adopted, and that, in default of such legal adoption, it devolves upon her as the heir at law. Marco Pizzati's contention is that the legacies in his favor (of the entire estate and one-half of the estate respectively) under the wills of January 14, 1910, and June 12, 1911, were not revoked, but were merely reduced, by the bequest of the disposable por-

tion to Woodville under the wills of October, 1911, and December, 1915.

[23, 24] There was, however, no intestacy, for the disposable portion of the estate was determined by the disposing capacity of the testator at the time of his death, and, as he then had no forced heirs, he was capable of disposing of all that he possessed, and did so, his disposition of the disposable portion constituting a universal legacy which included his entire estate.

"Thus," say the French authorities, with practical unanimity, "a legacy of 'that of which I am permitted to dispose,' or a legacy of 'the disposable portion,' constitutes a universal legacy, giving right to the whole of the property, if at the time of death there are no forced heirs, or if the forced heirs renounce or are excluded." Fuzier-Herman, vol. 2, p. 754, No. 8; C. N. 1003 (citing many authorities); Baudry-Lacontinerie, Des Donations et Des Testaments, vol. 2, p. 196, No. 2296; Demolombe, Traité des Donations, vol. 4, p. 472, n. 540; Coin-Delisle, art. 1003, n. 9; Duranton, vol. 9, p. 192 (3d Ed.); C. V., B. III, tit. II, Nos. 181, 182; Laurent, vol. 13, pp. 569, 572, citing a case (page 572) in which it was held that the legacy of the disposable portion of the estate of the testator was a universal legacy, and in which reference is made to a case decided by the Royal Court of Colmar in 1830 and affirmed by the Court of Cassation May 25, 1831, in which it was held that, an adoption having been annulled, no cognizance could be taken of it.

In Succession of Robert, 2 Rob. 427, this court had under consideration the will of a minor who actually resided in France, where the will was made and where, under the law, she had a forced heir, but whose legal domicile was in Louisiana, where her estate, consisting exclusively of movable property, was situated, and where she had no forced heir. The disposition in controversy reads, "Je donne et lègue à M. Gustave Allier, qui je dois épouser, tout ce dont la loi me permit disposer;" and it was held that it was to be construed in accordance with the law of Louisiana, and, so construed, meant that the testatrix intended to give all that she was capable of giving, and "that her disposition must prevail as a legacy of her entire movable estate."

The theory that the legacies in the earlier wills in favor of Marco Pizzati were not revoked, but were merely reduced, by those in the later wills in favor of Woodville, are equally and obviously untenable, since it is clear that, as the later legacy to Woodville, included the entire estate, there could be nothing left of the prior legacies bequeathing the entire estate or the half of it to another legatee.

[25] The remaining question is as to the agreement between Mrs. Pizzati, Marco Pizzati, and Robert Woodville represented by J. L. Warren Woodville, to the effect that the will of 1915 should be registered and executed as though the clause requiring Marco Pizzati to collate $20,000 had not been written, that (the will notwithstanding to the contrary) Marco Pizzati should receive one-quarter and Robert Woodville one-quarter of the net value of the estate, and that Mrs. Pizzati should receive her interest as widow in community. It is said in the original opinion, "and the agreement * * * is equally null, for it was entered into in the belief that there had been an adoption [of Marco Pizzati by Salvatore Pizzati], when, in point of fact, there had been none." Up to and until after the time that the opinion was handed down, the idea that Marco Pizzati had participated in the agreement in any other character than as the adopted son of Salvatore Pizzati seems never to have suggested itself to any one, and we are unable now to follow the learned counsel in their effort to show that he had some other status which gave him a standing upon which to predicate his participation in such an agreement.

For, though the agreement does not specifically mention the character in which he appeared, it contains intrinsic evidence upon that subject in the stipulation which accorded him a proportion of the estate equal to the légitime of a legally adopted son, no more and no less, which evidence, tending to show that he appeared in that character, is strongly corroborated by all that followed up to the time that it was held by this court that he was not legally adopted. Thus the agreement was entered into on January 3, 1916, as a preliminary to the opening of the succession, when there was no pending litigation, or, so far as appears, talk or threat of litigation, and in the original brief filed in this court by counsel for Marco Pizzati they say:

"Before opening his succession and before filing the will for probate, *the widow, the adopted son and the legatee of the disposable portion,* entered into a written agreement in the following words."

Then follows a copy of the agreement, the italics in the above being black-lettered in the brief.

On the day of its making, therefore, the parties to the agreement, describing themselves, respectively, as the widow, "adopted son," and "universal legatee" of the decedent, filed their petition in the district court praying that the will of December, 1915, be registered and executed. Thereafter, upon the filing by the executor of his account, "Marco Pizzati, adopted son of the late Salvatore Pizzati," again appeared by way of opposition thereto, setting up the agreement in question and praying, not that he be decreed owner of the entire estate according to the will of January, 1910, or of half of the estate, according to the will of June, 1911, but of one-fourth of the estate, apparently both in the capacity in which he sued and by virtue of the agreement upon which he sued. On the trial of the opposition, being called on to elect whether he claimed as an adopted son or under the agreement, his counsel (under protest) stated:

"We now declare that we stand on our rights as an adopted son, * * * and, in so far as the widow and the universal legatee are concerned, we stand upon the instrument herein declared upon in our opposition."

Which instrument, as we have seen, had been declared upon in the capacity of adopted son.

The judgment of the district court sustained the adoption, held that the opponent was under no obligation to collate the $20,000, and recognized him as the legally adopted child, "entitled to all the rights of a forced heir in the estate of the deceased, and entitled, under the agreement of January 3, 1916, to receive one-fourth of the net estate of the deceased."

In this court, on the appeal, Marco Pizzati, through his learned and able counsel, asserted his right in an original brief which bears the legend, "Original Brief in Behalf of Marco Antonio Pizzati, Adopted Son, Appellant," and which insists upon it throughout, that, for all the purposes of the case, Marco Antonio Pizzati was, and is, the adopted son of the decedent. Thus we find in support of the objection that Robert Woodville had no right to raise the questions argued at the bar, including the question of the validity of the adoption, the following passages:

"Second. The written agreement, made after the estate had vested by the death, absolutely precludes him from setting up the question he has here raised. That agreement subsists for the purposes of the case in its entirety. * * * Indeed, its validity is not disputed by his counsel, should the question of status be decided against him. This agreement was a ratification of the will and an adjustment of all differences which might be raised, or could have been raised, against the rights of either party to the same. *It is more than this; it is a recognition of the status of Marco Antonio Pizzati, and an establishment by consent of his interest in the estate, and of the interest of Robert Woodville the legatee.*" (Italics by the court.)

And the following page of the brief is devoted to an argument which inferentially admits that the agreement was entered into by Pizzati in the capacity of adopted son, but

denies the right of the other litigants to attack it on that account. Whatever, therefore, may be the present view of the learned counsel, and however ably that view may be supported in argument, we are satisfied that, when the agreement in question was entered into, it was with the understanding on the part of their client that he was acting in the capacity of adopted son, as well as in any other capacity that he might have possessed, and that, if it had not been so understood by the other parties thereto, there would have been no agreement. In addition to that, it now appears that J. L. Warren Woodville, who acted in the matter as representing Robert Woodville, was without authority in the premises, his mandate having been conceived in the most general terms and falling considerably short of authorizing him to renounce a succession or any part of a succession. C. C. 2996, 2997.

Our re-examination of the testimony offered in support of Dr. Rudolph's opposition has satisfied us that, whilst the doctor has somewhat overestimated the number of his consultations with the decedent, we have somewhat underestimated the character of the services that he was called on to render. He testifies that there were ten office consultations between November 2d and December 8th, from which last-mentioned date he visited his patient at the latter's temporary residence until he died, and that he paid an average of five visits a day during that period. The patient was at first suffering with dysentery, was taken with pneumonia on the 12th or 14th, and recovered on the 22d or 23d, and, after a few days, developed toxæmia, of which he died on the 30th, from which it would appear that the doctor visited him for 22 days, which, at the average of 5 visits a day, would be 110 visits. Beyond that, however, it appears that the patient was irritable and intractable, and at times violent, and that he required services from the doctor which should have been rendered by the nurses and would have been rendered by them if they had been permitted. Upon the whole we conclude that the compensation to be allowed should be increased to $1,000.

It is therefore ordered that the judgment heretofore handed down be amended by increasing the amount allowed Dr. Rudolph to $1,000, and condemning the succession to pay the costs of his appeal, and that, as thus amended, it be reinstated and made final.