## MIDWEST HOTEL CO. v. STATE BOARD OF EQUALIZATION
(No. 1510; January 17, 1929; 273 Pac. 696)

·*Edwin Barrett* and *Vincent Mulvaney* of Casper, for ap‑
pellant.

*W. O. Wilson*, Attorney General, and *J. A. Greenwood*, Deputy Attorney General, for respondent.

464

RINER, Justice.

This case is before the court on direct appeal from a judgment of the District Court of Natrona County, dismissing an appeal undertaken to be prosecuted by the Midwest Hotel Company, appellant, from a ruling made by the State Board of Equalization, relative to the valuation of appellant's property for purposes of taxation.

It appears from the record that about June 22, 1927, the Board of County Commissioners of Natrona County, sitting as a Board of Equalization in tax matters, after hearing, had increased the valuation of certain property owned by appellant and listed for taxation in the city of Casper. From this action of the county board, Midwest Hotel Company appealed to the State Board of Equalization, and that body, after hearing held on July 26, 1927, at which evidence seems to have been taken and both the local board and appellant were represented by their counsel, entered its "judgment and order" of date August 9, 1927, materially reducing the valuation of appellant's property, but not entirely to its satisfaction. Accordingly the Midwest Hotel Company sought to have this decision of the State Board of Equalization reviewed by the District Court on appeal. That court, as already indi-

cated, dismissed the appeal under the view that it was without jurisdiction to entertain such a proceeding.

The law which appellant invokes to sustain its position that the District Court was in error in making the order of dismissal complained of, is found in Section 1 of Chapter 56, Laws of 1923, which was an act relating to the duties of the State Board of Equalization and to amend and re-enact Section 2810 of Chapter 173, W. C. S. 1920. That part of the section pertinent here reads as follows:

"Provided that any person, persons, firm or corporation may have the right of appeal from the decision of the Board to the District Court of the County wherein the property is situated."

This clause follows language in the statute authorizing the State Board of Equalization, on proper notice to the parties interested, and upon due hearing had, to increase or decrease assessments of the taxpayers when their assessed property appears to have been overvalued or undervalued by the County Board of Equalization. It will be observed that there is no method whatsoever provided by the law whereby such an appeal is to be taken from the action of the State Board of Equalization to the District Court. Neither the time within which the appellate proceeding is to be commenced, nor the manner of its consideration by the reviewing court, are prescribed. Shall the District Court correct only errors of law alleged to be committed by the State Board of Equalization, or shall it retry the matter in its entirety, taking evidence anew, framing new issues and considering matters not submitted to the tribunal whose action is attacked? Shall the District Court undertake to substitute its judgment on questions thus brought before it for review for that of the State Board of Equalization, or shall the court be limited to keeping the board's action within the latter's proper sphere, as defined by the constitution and laws

enacted pursuant thereto? Faced with these inquiries, the statute before us is wholly silent. In this connection it may be noted that we are not here considering a right of appeal given by the Wyoming constitution.

Problems of the sort suggested may not lightly be cast aside in so important a matter as taxation, the source of government revenue. An extended examination of the laws of many of the states of the Union, framed to deal with the subject now under consideration, establishes that even where the right of appeal to the courts from the action of a State Board of Equalization is granted a taxpayer—after the latter has had the benefit of the conclusions of a local assessor and a local equalization board—the remedy as so given is often highly circumscribed: The time allowed for appeal is short; the entire amount of the tax involved is required to be deposited in court; a review is permitted of only those matters which were presented to the board; frequently only errors of law may be examined; and the trial court's decision on such an appeal is made final. In brief, the proceedings are quite summary in character. The governing principle back of such statutes undoubtedly is that there should be as little interference as possible with the due and prompt collection of taxes, consistent with a proper regard for the rights of the taxpayer under existing law.

In an endeavor to meet the uncertain and indefinite character of the statute now relied upon by appellant, it is suggested that where an appeal is expressly granted, the courts may look to other general statutes regulating appeals in analogous cases and give them such application as the particular case and language of the statutes may warrant, keeping in view always the intention of the legislature. A number of cases have been called to our attention and they have been examined with care. We do not find them in point here.

The decision in Blair v. Coakley, 136 N. C. 405, 48 S. E. 804, perhaps approaches most closely the matter in hand, but the law there drawn in question was far more complete than the one at bar. In that case it appeared that an appeal had been given in all proceedings to lay out or alter public roads, but the statute, while granting the right of appeal, did not provide any machinery for perfecting and prosecuting the appeal, except the requirement that a bond should be given by the appellant to the appellee ''as provided in other cases of appeal,'' and that the Superior Court at term should hear the whole matter anew. Declaring that the court should proceed by analogy to the practice in other like cases, it was held that the rules regulating appeals from justices' courts should be adopted as being more nearly analogous to those which should govern in the case before it. But the appellant having failed to obey those rules, the action of the court below, in dismissing the appeal, was affirmed.

To supply omitted material in a statute is often one of the most delicate and difficult tasks which can fall to the lot of a court of last resort. It is quite true that courts should endeavor by every rule of construction to ascertain the meaning of, and give effect to each enactment of the legislature. It is equally axiomatic under our system of government that courts may not legislate. We think, therefore, that it is deducible both logically and from the current of authority that when a statute has been left by the lawmaking power unfinished and so indefinite and uncertain as to be incapable of enforcement, there remains nothing for the courts to do but to declare it void.

In Lewis' Sutherland Statutory Construction (2nd Ed.), Sec. 86, the author remarks on the point we are now considering:

''But if, after exhausting every rule of construction, no sensible meaning can be given to the statute, or if it is

so incomplete that it cannot be carried into effect, it must be pronounced inoperative and void.''

The same principle has been declared in the case of State v. State Board of Canvassers, 159 Wis. 249, 150 N. W. 542, where it was said:.

"If the enactment is so uncertain that the court is unable to determine, with any reasonable degree of certainty, what the legislature intended, or it is so incomplete that it cannot be executed, there is no other course open but to condemn it as void for uncertainty, as this court has done on other occasions, and other courts have done so often that the duty in that regard has become a matter of unwritten law.''

In Hettinger v. Good Road District No. 1, 19 Idaho 313, 113 Pac. 721, the statute, while authorizing the issue of bonds of a road district, provided no method of giving notice of the election sanctioning the issue or the manner of conducting the same. It was argued that certain other provisions of law relative to procedure supplied the deficiency. In holding otherwise and declaring the bond issue of the district void and illegal, the following language was used:

"It is also contended that the bond election was illegal and void for the reason that the statute does not provide for holding such election. Section 1054 of the Revised Codes authorizes the good road commissioners, 'with the consent of a two-thirds majority of the qualified electors at their respective districts, voting at any election held for the purpose of issuing bonds, to issue bonds not exceeding 25 per cent of the assessed value of the real property within such good road district.' This section, however, makes no provision for any notice of election or the manner of conducting the same, or the qualification of the voters thereat, or how, or in what manner, or by whom, such election shall be held. Counsel for respondent, however, contends that the provisions found in Section 1052 of the Revised Codes, in relation to the election of road

commissioners, should apply to elections held under the provisions of Section 1054 for the issuing of bonds. Section 1052 provides with reference to the holding of elections for road commissioners as follows: 'The said elections, notices thereof and the manner of conducting the same, shall be in all respects like those now required for the election of school directors in independent school districts.' This section, however, in no way refers to elections to be held for the purpose of authorizing a bond issue, and there is no intimation by any language used in the section that the legislature intended to make the statute with reference to holding elections for directors in independent school districts apply and govern elections held under the provisions of Section 1054. The elections referred to in Section 1052 relate wholly to the organization of the district and the election of commissioners for such districts, and no reference is had to elections held under the provisions of Section 1054. In fact, there is no method provided in Section 1054, or in any other part of the act, which provides for the method or the machinery for carrying out and executing this section. The section, therefore, is uncertain, indefinite, and incapable of execution, and is invalid and of no force or effect."

The case of Succession of Pizzati, 141 La. 645, 75 So. 498, is to the same effect. It involved the legality of an adoption of a son who was not a minor but a major at the date of the adoption. The statute authorized the adoption of majors but made no provision for any form of proceedings for effecting such adoption. It was insisted that the method used—by notarial act—was proper as showing an intention to adopt. It negativing this contention and deciding that the adopting was void, the opinion of the court presents a very elaborate discussion of the matter and from it we take the following excerpts:

"Counsel are positive that this mode by notarial act which they are holding to be good is good; but they have no better legal ground to stand on for saying so than some other party who has chosen some other mode (no matter how fantastic) would have for saying that this

other mode was good. The law alone can fix this mode; the courts cannot do so, nor can the parties. * * *

"The maxim that where there is a right there is a remedy does not apply to such a case as this. This maxim means nothing more than that whatever may be due to one may be demanded judicially in some form or other; or, in other words, that the courts are open for the vindication of all rights no matter what they may be.

"Nor can the maxim that when anything is granted that also is granted without which the thing granted could not exist help the situation in any degree; for after we have applied it we are still confronted with uncertainty as to what thing has been granted; and the right to adopt is the right to endow some one with the status of a legitimate child; but how, by what means, is this to be done? The answer must be, by any means which the parties may choose to adopt, if it is to be done at all; for the law does not prescribe any particular means, and the courts are powerless to do so, as it would be legislation.

"The maxim applicable is rather, '*ubi jus incertum, ibi jus nullum;*' where the law is uncertain, there is no law. When Article 214 says that 'any person may adopt another,' it says that any person may do an act which when done will have the effect of immediately and irrevocably creating the status of legitimate child for the adoptee, thereby immediately and irrevocably disturbing the order of successions among the legal heirs outside of the forced heirs. But it does not say what this act shall be which shall operate this immediate, important, and irrevocable change. And when we put to our legislation the question, 'What shall this act consist of?' we get no answer. We are met by a Sphynx-like silence. We know, of course, that it is to be an act of adoption, but when we come to inquire what an act of adoption consists of, we find that it must necessarily consist of what the law expressly provides it shall consist of, or else of whatever form or ceremony the fancy of the parties to the adoption may lead them to choose for serving as an outward demonstration of their intention to effectuate an adoption, and that we would have absolutely nothing to stand on in law for saying that one form of adoption was better than another, so long as it could serve as an outward demonstration of the intention of the parties by being susceptible of proof in court under the ordinary rules of evidence.

"Unless we are prepared to hold that adoption may be effected in any mode which the fancy of the parties may dictate (no matter how fantastic), we have to conclude that it can be effected only in some mode expressly provided by law; and this last is our conclusion.

"The adoption, not having been in the form prescribed by law, is null."

Where a statute was found to be not susceptible of any construction which would enable the court to carry out its provisions, the opinion in The State ex inf. Attorney General v. West Side Street Railway Co., 146 Mo. 155, 47 S. W. 959, employed the following very pertinent language:

"An act of the legislature, to be enforceable as a law, must prescribe a rule of action, and such rule must be intelligibly expressed.

" 'It is plainly the duty of the court to so construe a statute, ambiguous in its meaning, as to give effect to the legislative intent, if this be practicable.  *  *  *  But a statute must be capable of construction and interpretation; otherwise it will be inoperative and void.  The court must use every authorized means to ascertain and give it an intelligible meaning; but, if after such effort it is found to be impossible to solve the doubt and dissolve the obscurity, if no judicial certainty can be settled upon as to the meaning, the court is not at liberty to supply, to make one.  The court may not allow 'conjectural interpretation to usurp the place of judicial exposition.'  There must be a competent and efficient expression of the legislative will.'  *  *  *

"It is manifest that an act of the legislative department can not be enforced, when its meaning can not be determined by any known rules of construction.

"The courts can not venture upon the dangerous path of judicial legislation to supply omission, or remedy defects in matters committed to a co-ordinate branch of the government.  It is far better to wait for necessary corrections by those authorized to make them, or, in fact, for them to remain unmade, however desirable they may be, than for judicial tribunals to transcend the just limits of their constitutional powers."

In Chaffee's Appeal, 56 Mich. 244, 22 N. W. 871, the act of the legislature authorized a municipal corporation to open and widen streets, but prescribed no procedure for cases of widening streets. It was held, Justices Cooley and Campbell concurring, that the act was inoperative as to the matter of widening streets, the tenor of the decision being indicated by the following:

"The first section of the act delegates the power to the city to take private property for the purpose of widening a street, and to take the proceedings for that purpose provided in the act; but through some oversight the necessary proceedings for that purpose do not seem to have been provided. The right, therefore, to take property to widen a street is not available. * * *

"In a statute authorizing these proceedings, or in the proceedings themselves, nothing should be left in doubt or uncertainty as to their character or object, or in the means provided for the accomplishment of the object."

Ward v. Ward, 37 Tex. 389, was a case where a statute authorized appeals from interlocutory judgments or orders thereafter rendered by the District Courts and directed that such appeals "be regulated by the law regulating appeals from final judgments in the District Court, so far as the same may be applicable thereto." An examination of the statutes governing appeals from final judgments made it plain that they were entirely inapplicable to appeals from interlocutory decrees. Confronted with this situation, the court remarked in part:

"If, then, we find the Act of November 1st, 1871, referring for its execution to other laws which can have no application, we are at a loss to know how the Act can be administered. This is a matter of too great public importance to be left to any uncertainty, or even to admit the courts to fix upon any rule of practice that could govern; * * *

"We hesitate, to consider well any judgment of ours which declares unconstitutional or void an Act of the Legislature, paying due deference to the learning and wis-

dom of that branch of the government. But when we find ourselves totally unable to administer a law by reason of its uncertainty or ambiguity, or believe it to be unconstitutional, we shall not hesitate to discharge the duty which the law devolves upon us.

"We do not mean to say, by any means, that the Act of November 1st, 1871, is unconstitutional, but we do say that it is nugatory and void for want of some adequate provision in the law to carry out its execution."

To the same purport is the case of Dial v. Collins, 40 Texas 367.

In the early days of the Supreme Court of the United States, Chief Justice Ellsworth, in Wiscart v. Dauchy, 3 Dallas 321, 1 L. Ed. 619, remarked concerning its appellate jurisdiction conferred by the National Constitution:

"In all other cases, only an appellate jurisdiction is given to the court; and even the appellate jurisdiction is, likewise, qualified; inasmuch as it is given 'with such exceptions, and under such regulations, as the Congress shall make.' Here then, is the ground, and the only ground, on which we can sustain an appeal. If Congress has provided no rule to regulate our proceedings, we cannot exercise an appellate jurisdiction; and if the rule is provided, we cannot depart from it. The question, therefore, on the constitutional point of an appellate jurisdiction, is simply, whether Congress has established any rule for regulating its exercise?"

In the case at bar the appellant in its attempted appeal to the District Court appears to have adopted the practice very fully outlined in Chapter 60, W. C. S. 1920, for appeals from the State Land Board. But Section 1 of Chapter 56, Laws of 1923; is authority for no such procedure. Upon a general examination of our statutes, we find that in addition to the appeal allowed by Chapter 60, supra, they provide also for appeals to the District Court from certain decisions of the State Board of Control, from the judgments of justices of the peace, from the action of the Boards of County Commissioners in disallowing claims

against the county, and from the boards last mentioned, when exercising their jurisdiction in road cases. Other instances of appeals to the District Court provided for by law also exist.

The several appeals thus granted to dissatisfied suitors have each their own form of procedure assigned them by the law. While it is true they all possess certain similarities in some respects, in others they differ very radically. No hint is given in the statute involved here as to the intention of the legislature concerning the method of procedure fit and proper to a case of this kind. We cannot say which it was the intention of the lawmaking power to adopt. The method of appeal pursued by the appellant in the case at bar has no greater sanction in the statute than an appeal taken in one of the other methods to which we have made reference. Another litigant might quite as well conclude that the manner of appeal provided by law from decisions of the State Board of Control presented just as analogous a method as that followed in the instant case, although in that event the transcript on appeal might be filed at any time within six months of the decision and would be required to contain all the evidence offered before the body from which the appeal was taken. It would clearly be impossible for this court to say with any foundation in the legislative act, which party had adopted the correct procedure. The statute is obviously too indefinite and uncertain to be given effect in view of the many different methods of prosecuting and perfecting appeals permitted by the statutes of this state.

Entertaining the view that in order to supply the manifest deficiencies of the law, it would be necessary for us to pass beyond the proper limit of this court's constitutional powers, our conclusion is that the action of the trial court, in dismissing the appeal, was proper, and it is accordingly affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.