[Criminal No. 733. Filed April 13, 1931.]

[297 Pac. 1037.]

C. E. CLAYTON, Appellant, v. STATE, Respondent.

136

Messrs. Flanigan & Fields, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Arthur T. La Prade, Assistant Attorney General, Mr. Charles A. Carson, Jr., City Attorney, and Mr. James E. Nelson, Assistant City Attorney, for the State.

ROSS, J.—The defendant, C. E. Clayton, upon a charge of driving an automobile in the streets of Phoenix while under the influence of intoxicating liquor, was tried and convicted under an ordinance of the city in the police court thereof. Upon an appeal to the superior court of Maricopa county he was accorded a trial *de novo* and again convicted, and sentenced to serve 40 days in the city jail and to pay a fine of $250. He has appealed.

On November 27, 1929, the city commission of the city of Phoenix passed Ordinance No. 1492 "regulating traffic upon the public streets of the city," section 55 of which reads, in part, as follows:

"It shall be unlawful for any person who is under the influence of intoxicating liquor or narcotic drugs to drive any vehicle upon any street or other public way."

It provides a penalty of not less than 30 days nor more than six months in the city jail, or a fine of not less than $100 nor more than $300, or both such fine and imprisonment.

It is contended the city was without statutory or charter authority to enact section 55, for two reasons: (1) Because the subject matter therein is completely covered by the legislature in chapter 31, sections 1557–

1726, Revised Code of 1928, commonly known as the Highway Code; and (2) because said section 55 does not have for its purpose the regulation of traffic upon the streets of Phoenix, but is an interdiction upon certain physical and mental conditions of motor vehicle drivers. The legislation on the subject of insobriety of motor vehicle drivers is found in the Highway Code, section 1688, reading as follows:

"Any person under the influence of intoxicating liquor or narcotic drugs, or who is an habitual user of narcotic drugs, who shall drive any vehicle upon any highway within this state shall be guilty of a misdemeanor and punished by imprisonment in the county jail for not less than ninety days nor more than one year, or by fine of not less than two hundred nor more than five thousand dollars."

The Highway Code as originally passed was carried forward into the Revised Code of 1928 with some modifications but with no material changes, especially as to its purpose and object. Its title as originally enacted (chapter 2, 4th Sp. Sess., Laws 1927) is, in part, as follows:

"To provide a code for the systematic and orderly administration of all matters and affairs directly affecting or concerning the highways of the state; . . . to regulate the operation of vehicles on highways, and promote the convenience and safety of highway travel; to provide penalties for violations of the provisions of this act," etc.

In *Olson* v. *State*, 36 Ariz. 294, 285 Pac. 282, we held that the Highway Code as contained in the revision of 1928 covered "fully and completely the subject of highway legislation" and repealed directly and by implication all previous legislation on the subject matter of highways.

That the regulations of the Highway Code were intended to apply to city streets is not only manifest from the title of the act as originally passed, but from

its various provisions, wherein the speed of motor vehicles in business and residential districts is fixed (section 1587); wherein the local authorities may authorize increased speed upon through highways (section 1588); wherein police, firemen, ambulances in emergencies, and physicians may exceed the speed limit (section 1591); wherein police and fire vehicles are given right of way over others (section 1598); wherein the manner of passing street-cars and safety zones are provided for (section 1601); and wherein parking before fire hydrants, fire stations, and private driveways is prohibited (section 1603). In these, and other particulars not enumerated, the Highway Code manifests a purpose to cover the whole subject of highways and to regulate their use by the public in cities and towns as well as in the country. The inhibition against a driver under the influence of intoxicating liquor is one of the many regulations to be observed by those using the public highways, rural and urban alike. Section 1664 provides that if any person is convicted of violating any law regulating the operation of a motor vehicle upon the highways his license shall be revoked, and names as such a violation the offense of driving a motor vehicle while under the influence of intoxicating liquors as prescribed in section 1688.

Under section 1574 the matter of "local parking and other special regulations" is left in the control of the governing body of the city; that is, matters of peculiar local concern are left with the local authorities. The reservation to cities and towns of power over "local parking and other special regulations" would seem to emphasize a purpose on the part of the legislature to make the provisions of the Highway Code in all other respects the guiding and controlling rule throughout the state. Any deviations from the regulations prescribed in the Highway Code to suit

local conditions or convenience are provided for therein.

The regulation or provision as to the insobriety of a driver is exactly the same in the Highway Code and section 55 of the city ordinance, except as to punishment. The punishment under the ordinance is not as great as may be inflicted under the state law, and the confinement is in the municipal and not the county jail. Under the state law the offense is a high misdemeanor. The act condemned in both is the same. "Highway" is defined in section 1686 as "any way, road or place of whatever nature, open to the use of the public as a matter of right for the purpose of vehicular travel," which includes streets and public ways of a city or town.

We have this situation: The sovereign state and one of its agencies, the city of Phoenix, have legislated upon the identical subject matter, for the same purpose, to wit, to secure the safety of travel upon the highways of the state. The prohibition in the city ordinance and in the statute is not against inebriety, but against driving on the highways while under the influence of liquor. The provisions in each are primarily regulatory, the punitive feature being incidental. Their purpose is to secure safe driving of a very dangerous instrumentality, which is not regarded as possible when the driver's condition is influenced by intoxicating liquor. Have these two jurisdictions concurrent power to legislate on the same subject matter, as they have done? There is no question about the state's right. The state, acting through its legislature, has plenary power over the highways of the state, including those within cities and towns. It is said:

"Such power (to control and regulate the use of highways) may be delegated to local authorities, but the power so delegated will be strictly construed, and the authorities to whom it is delegated must keep

within the limits of the grant, and cannot exercise it beyond what is necessary to facilitate travel." 29 C. J. 646, § 409.

Therefore, if the city of Phoenix can pass by-laws to regulate the conduct of drivers in the use of highways within its boundaries, it is because the power to do so has been delegated to it by the state. The city may acquire such power in any one of three ways, according to 1 Dillon on Municipal Corporations, fifth edition, section 237:

"First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied."

Phoenix has a "freeholders'" or "home rule" charter. Section 2 of article 13 of the state Constitution provides that the electors of a city of more than thirty-five hundred population "may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the State"; that when ratified at an election and approved by the Governor such charter "shall become the organic law of such city and supersede any charter then existing (and all amendments thereto) and all ordinances inconsistent with said new charter."

Freeholders' charters, similar or identical with ours, have been provided for by several of the states in their Constitutions. The courts in construing such charters uniformly hold that the grant of power therein to the municipality is confined to its municipal affairs, or those incident or appertaining thereto. The rule stated by the Missouri court has been frequently cited and approved. It is:

"A charter framed under that clause of the Constitution, within the limits therein contemplated, has a force and effect equal to one granted by an act of the Legislature. But it is not every power that may be essayed to be conferred on the city by such a charter that is of the same force and effect as if it were conferred by an act of the General Assembly, because the Constitution does not confer on the city the right [in framing its charter] to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality, yet the Legislature may, if it should see fit, confer on the city powers not necessary or incident to the city government. There are governmental powers, the just exercise of which is essential to the happiness and well-being of the people of a particular city, yet which are not of a character essentially appertaining to the city government. Such powers the state may reserve to be exercised by itself, or it may delegate them to the city, but until so delegated they are reserved. The words in the Constitution, 'may frame a charter for its own government,' mean, may frame a charter for the government of itself as a city, which includes all that is necessary or incident to the government of the municipality, but not all the power that the state has for the protection of the rights and regulation of the duties of the inhabitants in the city, as between themselves." *State* v. *Missouri & Kansas Telephone Co.,* 189 Mo. 83, 88 S. W. 41.

The Missouri rule was approved by the leading case of *Consumers' Coal Co.* v. *City of Lincoln,* 109 Neb. 51, 189 N. W. 643; that court saying:

"We approve this concept of the nature of the charter. While the power to form a charter may be likened to the power of the people to form a Constitution, the subjects over which it may be exercised are confined to those matters appertaining to city government."

In *City of Sapulpa* v. *Land,* 101 Okl. 22, 35 A. L. R. 872, 223 Pac. 640, in construing powers of a city under a freeholders' charter, it was said:

"Our state Constitution, in authorizing cities of 2,000 or more inhabitants to adopt a charter form of municipal government, in no way limited or abridged the supreme sovereign control over such municipality, but only guarantees to such municipality the right of municipal government subject to the Constitution and laws of the state. . . .

"The only reasonable construction of said section [3a of article 18, Williams' Ann. Const.] is that when such city adopts the freeholders' charter form of government, in the exercise of its power as a municipal government, the same must be consistent with the organic law of the state and subject to the supreme powers of the Legislature. If our conclusion be not correct, then we have the inevitable result that the framers of the Constitution authorized the establishment of independent petty states within this state. The language used in section 3a, *supra,* is not subject to such a construction."

The charter of the city of Phoenix does not expressly empower the legislative body of the city to pass by-laws regulating drivers of motor vehicles in the use of its streets and public ways. If such power exists in the charter, it must be found in sections 1 and 2, chapter IV thereof, reading:

"Section 1. The legislative powers of the City of Phoenix shall be vested in and exercised by the Commission except as herein limited or reserved to the electors of the city. The legislative powers of the city shall extend to all rightful subjects of legislation not forbidden by the constitution of the United States, the constitution or laws of the State of Arizona, or the provisions of this Charter.

"Section 2. As the legislative organ of the City of Phoenix, the Commission, subject to the provisions and restrictions of this Charter, shall have the power by proper ordinances or resolutions, to carry out each and every power, right, and privilege herein and hereby vested in the City of Phoenix, and by such legislation to enforce said rights, powers and obligations, and to secure the performance of all obligations

and indebtedness to others. And in addition to the powers hereinabove enumerated and referred to, the city, and the Commission acting for and in its behalf, shall have the further powers hereinafter enumerated and set forth, to-wit: . . .

"(64) To enact appropriate legislation and do and perform any and all other acts and things which may be necessary and proper to carry out the general powers of the city or any of the provisions of this Charter; to exercise any and all powers not in conflict with the constitution of the State, with this Charter, or with the ordinances adopted by the people of the city; to do and perform all acts required by the laws of the State; to exercise and carry into effect whenever deemed necessary or proper, any and all additional powers vested in the city or the Commission by the laws of the State."

(The first 63 subdivisions of section 2 are specific grants of power, none of which refer to the subject matter under discussion.)

Section 1 and the parts of section 2 quoted limit the power of legislation by the city commission to "rightful subjects" and "to appropriate legislation . . . to carry out the general powers of the city or any of the provisions of this Charter. . . . "

The general powers conferred on the city by the freeholders' charter are those concerning municipal or local affairs. See cases above cited. The city does not assume under its charter all the powers that the state may exercise within its limits, but only powers incident to a city government. "Rightful subjects" of legislation thereunder are therefore local or municipal concerns of the city. Under this grant of power the city cannot enter the field of general legislation, but must confine itself to the making of by-laws for its local government. In the latter field, under the Constitution so long as the legislation is in harmony with that instrument and the laws of the state it is valid and, under the provisions of section 398, Revised Code of 1928, prevails over state

legislation conflicting therewith. If, however, a city by-law is not about a matter of municipal concern but a matter of general statewide concern, it would not be a "rightful subject" of legislation, as defined by the general grant of power in the charter. The police power inheres in the state and not in its municipalities. The latter are agencies of the state and exercise police and other powers only by grant given either directly or by necessary implication. We think the broad grant of powers contained in sections 1 and 2, chapter IV of the charter, should be, and was intended to be, limited to by-laws concerning purely municipal affairs.

Who, then, determines whether the use of the streets and highways of the city by a person under the influence of intoxicating liquor is of general statewide concern or of purely municipal concern? Shall the city be permitted to determine this question, or shall the state?

It is said in *State* v. *Thompson,* 149 Wis. 488, Ann. Cas. 1913C 774, 43 L. R. A. (N. S.) 339, 137 N. W. 20:

"Where 'sovereignty' or even 'control' is by Constitution or statute distributed between the state and the city with reference to the subjects of regulation by each, if the city were sovereign in all 'municipal affairs' and the state in all other affairs, still the city could not conclusively determine what affairs are 'municipal,' for to permit it to do so would be to confer upon the city an overlordship which would finally draw all power to the city. But in such case either one must have this power, and that one is the state. Under our American theory of the origin and office of Constitutions, the state may do this through its Legislature and judiciary. The former can create legal conditions, can make 'affairs' municipal or state, as it deems wisest or most expedient."

To the same effect is *City of Sapulpa* v. *Land, supra.*

We have already seen that the state legislature in the Highway Code (see title to original act, *supra*) has assumed "to regulate the operation- of vehicles on highways, and promote the convenience and safety of highway travel" and "to provide penalties for violations of the provisions of this act."

While the Highway Code in many respects, as is shown by our analysis thereof, has delegated or left to municipalities certain powers over their streets and highways, it has by most direct and positive provision retained power to regulate the condition of drivers of motor vehicles in the use of the highways of the state, including those in cities and towns.

Supplementing section 2 of article 13 of the Constitution, the legislature, in section 398 of the Revised Code of 1928, has provided that in case of conflict the charter provisions shall prevail over existing laws and shall operate as a repeal or suspension of such laws to the extent of such conflict, but "that such charter shall be consistent with and subject to the state constitution, and not in conflict with the constitution and laws relating to the exercise of the initiative and referendum and *other general laws of the state not relating to cities.*" (Italics ours.) This recognizes the supremacy of the "general laws of the state not relating to cities." The Highway Code is such a law. It does not relate to cities, but to the public highways of the state generally.

There is no power, either express or implied, in the charter authorizing the legislative body of the city of Phoenix to pass a by-law making it a crime to drive a motor vehicle on highways while under the influence of intoxicating liquor. If the city possesses such power, it must be found in the general laws, and the only expression in the general laws that might be said to confer such power is found in section 408, Revised Code of 1928, reading:

"In addition to the powers already vested in cities by their respective charters and by the general laws, cities and their common councils shall have the following powers: 1. To lay out and establish, open, alter, widen, extend, grade, pave or otherwise improve streets, alleys, avenues, sidewalks, parks and public grounds, and vacate the same; to plant trees thereon; to regulate the use thereof. . . . ''

We think the power therein conferred "to regulate the use" of streets, alleys, etc., must be construed in connection with the limitations expressed and implied in the Highway Code. The latter has declared who may drive motor vehicles upon the highways of the state; has provided for their licensing (section 1655 et seq.), and the grounds upon which their licenses may be revoked (section 1664 et seq.), naming as one of such grounds the driving of a motor vehicle while under the influence of intoxicating liquor, and under section 1688 has made it an offense to drive while in such condition. In other words, the legislature in the Highway Code has made all of these things, as to the qualification or fitness of motor vehicle drivers and their punishment for infractions of the regulations therein prescribed, "state affairs," taking from municipalities the power to legislate thereon as effectively as if directly prohibited to them.

It has been held that a state-wide Motor Vehicle Law making the driving of a motor vehicle while under the influence of intoxicating liquor a felony, or a high misdemeanor, in the discretion of the court, supersedes a local city ordinance making the same act a misdemeanor, on the ground that the condition of the driver of a motor vehicle was of state-wide concern. *Helmer* v. *Superior Court,* 48 Cal. App. 140, 191 Pac. 1001. The reasons given by the court, it seems to us, are peculiarly applicable to the situation presented under our Highway Code. The court there said:

"The act of driving a motor vehicle while under the influence of intoxicating liquors is of no immediate or special concern to the city as such. It is of general concern to the inhabitants of a city in common with all other residents of the state. There exists a doubtful or twilight zone separating those matters that are clearly of municipal concern from those that are not. This doubtful zone is of greater or less width, according to the viewpoint of the observer, but there seems to be no satisfactory reason for assigning the act in question to this doubtful zone. It is not a 'municipal affair.' Section 17, although it forms a part of the Motor Vehicle Act, is not a traffic ordinance. It makes no provision of any kind whatsoever as to the method of driving, the rate of speed, the side of the road to be traversed, the giving of proper signals, nor, in fact, any sort of provision or condition having reference to the use of the roadway in any given manner. It relates wholly to the person himself and his then present condition, and without reference to the effect of his acts upon the roadway itself or of other persons making use thereof.

"The interdicted act relates to traffic no further than that a person in the prescribed condition may not avail himself of the use of the streets whereon traffic exists. A person discharging firearms or spreading poison gases while driving an auto on the highway would be a menace, much as the drunken driver is, but in no sense would his act be a matter of municipal concern as distinguished from the general concern of the people of the state. Regulations as to speed have reference to both time and place. That which would be a reckless rate of speed in a crowded city during busy hours would entail little or no danger on a remote roadway or during slack hours. The act charged against petitioner has no reference either to time or place."

This case is quoted with approval in *State* v. *Mandehr,* 168 Minn. 139, 209 N. W. 750, wherein the court said:

"The true purpose of all municipal ordinances is to regulate local affairs. The sobriety of drivers of

motor vehicles is not a local affair. It is a matter of concern to all the people of the state. A driver under the influence of intoxicating liquor is a menace to every one who happens to be on the road or street while he is at large. It is true that he is a greater menace when he selects a busy street as a driveway instead of a remote country road.''

See, also, *City of Buffalo* v. *Lewis*, 192 N. Y. 193, 84 N. E. 809.

We conclude that the legislature in the Highway Code has determined that the sobriety or insobriety of a motor vehicle driver on the public highways of the state is a matter of state-wide policy and concern, and that it was desirable that the rule with reference to such drivers should be uniform throughout the state.

It follows, then, that section 55 of Ordinance No. 1492 of the City of Phoenix is invalid, and that the court was without jurisdiction of the defendant or the subject matter.

The judgment of the lower court is therefore reversed, and the cause remanded with directions that the defendant be discharged.

McALISTER, C. J., and LOCKWOOD, J., concur.