JUSTICE BOLICK,
concurring in part and in the result:
¶ 66 The Court does a fine job harmonizing and applying what it aptly refers to as the “muddled” jurisprudence governing conflicts between city charters and state law and it reaches the correct result. Although I join fully in Parts I, II, and V of the Court’s opinion, I write separately to address erroneous prior decisions that produced the jurisprudential muddle, from which we can extricate ourselves by aligning our case law with constitutional text.
¶67 The Court describes this as a “gratuitous" endeavor. Respectfully, it is not. Although the parties may determine what issues are placed befoi’e us, they cannot constrain our analysis when a law’s constitutionality is questioned. In every instance, that analysis should begin with the Constitution’s text. Such analysis consists not merely of recitation but application, ‘We look first to the language of the provision, for if the constitutional language is clear, judicial construction is neither required nor proper.” Perini Land & Dev. Co. v. Pima Cty., 170 Ariz. 380, 383, 825 P.2d 1, 4 (1992); Jett v. City of Tucson, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994) (“If the language is clear and unambiguous, we generally must follow the text of the provision as written.”). Resort to the Constitution’s plain meaning is especially essential where, as the Court freely acknowledges, the state of the law is disarray, See, e.g., ¶ 46 (noting that the Court has at least twice described *605 our jurisprudence as creating a “twilight zone”). In such instances, our fidelity should be to the Constitution rather than to the disarray. See, e.g., McDonald v. City of Chicago, 561 U.S. 742, 805-06, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Thomas, J„ concurring in part and concurring in the judgment) (agreeing that the Second Amendment is applicable to the states, but urging the Court to abandon a “well-settled” but misguided test in favor of “a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment’s text and history”).
¶ 68 Article 13, section 2, of the Arizona Constitution possesses the virtue of great clarity. It provides cities that meet certain criteria -with a mechanism to secure greater self-governance. That section includes two provisions that squarely address the issue presented here. An eligible city “may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state." Ariz. Const, art. 13, § 2 (emphasis added). Upon approval, the “charter shall become the organic law of such city and supersede any charter then existing ... and all ordinances inconsistent with said new charter.” Id. (emphasis added).
¶ 69 That clear language renders simple the dispute here. As the Court amply demonstrates, Tucson’s charter provision conflicts with state law regarding the disposition of seized firearms. Tucson’s charter is subject to that law and does not supersede it.
¶ 70 Were we construing and applying only the constitutional text as written, we would have no jurisprudential muddle. Charter cities and the state would understand their respective boundaries and taxpayers could save the cost of unnecessary litigation. But the tendency of the law toward complexity over clarity often seems irresistible.
¶ 71 As the Court observes, the law governing conflicts between state and charter cities did not end with the Constitution. Shortly after the Constitution’s ratification, the legislature passed an emergency statute presently codified as A.R.S. § 9-284 (the “charter statute”). Section 9-284(A) provides that where charter provisions “are in conflict with any law” relating to cities eligible for charter status “in force at the time of the adoption and approval of the charter, the provisions of the charter shall prevail notwithstanding the conflict.” Section 9-284(B) provides, “The charter shall be consistent with and subject to the state constitution, and not in conflict with the constitution and ... general laws of the state not relating to cities.”
¶72 Two observations about the charter statute are pertinent, First, it established that charter provisions would prevail only as to conflicting statutes “relating to” charter-eligible cities “in force at the time of the adoption and approval of the charter.” Thus, the charter statute does not apply here because Tucson’s charter was adopted long before the conflicting statute. Second, if article 13, section 2, of the Arizona Constitution itself established supremacy of charters over certain conflicting state statutes, there would have been no need to enact that status through legislation, much less on an emergency basis. The statute’s enactment thus implied the legislature’s recognition that article 13, section 2 did not, by its own terms, elevate charters over statutes.
¶73 Early cases harmonized the charter statute with the Constitution. In Clayton v. State, 38 Ariz. 135, 297 P. 1037 (1931), the Court invalidated local highway laws that conflicted with state statutes. The Court posed the question of who determines whether a matter is of “general statewide concern or of purely municipal concern? Shall the city be permitted to determine this question, or shall the state?” Id. at 145, 297 P. 1037. Applying the Constitution, the Court’s answer was unequivocal: the state. Id. (quoting State v. Thompson, 149 Wis. 488, 137 N.W. 20, 31 (1912)) (even where the Constitution divides powers between the state and cities, the state alone determines what is a municipal concern). Quoting the Oklahoma Supreme Court, the Court observed that the Constitution “in no way limited or abridged the supreme sovereign control over such municipality, but only guarantees to such municipality the right of municipal government subject to the Constitution and laws of the state.” Id. at 143, 297 P. 1037 (quoting City of Sapulpa v. Land, 101 Okla. 22, 223 P. 640, 646 (1924)). If *606 charter powers were not “subject to the supreme powers of the Legislature!!,] ... then we have the inevitable result that the framers of the Constitution authorized the establishment of independent petty states within this state.” Id. (quoting City of Sapulpa, 223 P. at 646).
¶ 74 The Clayton Court continued its analysis, however, by noting that article 13, section 2 was supplemented by statute. Id. at 146, 297 P. 1037. The Court explained that under the statute, where a conflict exists between preexisting state laws and charter provisions, the latter shall prevail except as to general laws of the state not relating to cities. Id. The Court went on to conclude that the law at issue was a general law not relating to cities, thus it prevailed over the conflicting charter provision. Id. at 146-49, 297 P. 1037. The Court made clear that it was the statute (which is not at issue here), not the Constitution, that allowed charter provisions to prevail over conflicting state laws in limited circumstances. Id.; see also ¶ 39 (acknowledging that the statute, not the Constitution, established charter cities’ primacy over state laws in certain circumstances).
¶ 75 In Mayor & Common Council of City of Prescott v. Randall, 67 Ariz. 369, 196 P.2d 477 (1948), the Court struck down a charter city’s alcohol regulations that conflicted with state law. The Court cited numerous cases to the effect that “a charter city is sovereign in all of its ‘municipal affairs’ where the power attempted to be exercised has been specifically or by implication granted in its charter.” Id. at 371, 196 P.2d 477. However, the Court noted that in “practically all of the foregoing cases the effect of section 16-303 [predecessor to § 9-284] .., has been directly or indirectly considered by this court” as supplementing charter powers conferred by the Constitution. Id.; see also City of Tucson v. Ariz. Alpha of Sigma Alpha Epsilon (AASAE), 67 Ariz. 330, 335, 195 P.2d 562 (1948) (resolving conflict between state and charter city laws pursuant to charter statute).
¶ 76 But only three years later, those statutory considerations vanished from the Court’s analysis and the charter statute was grafted onto article 13, section 2. In Strode v. Sullivan, 72 Ariz. 360, 236 P.2d 48 (1951), the Court held that a charter city’s election laws superseded conflicting state law. The Court selectively quoted article 13, section 2, placing emphasis on a city forming a charter “for its own government” and omitting any reference to charter’s superseding inconsistent local laws but not state laws. Id. at 364, 236 P.2d 48.
¶77 Without any overt indication that it was doing so, the Court substituted the charter statute language for the constitutional text. The difference between the constitutional rule announced in Strode and the actual constitutional text is so stark that it invites direct comparison:
Article 13, section 2:
Eligible city “may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state.... [S]aid charter shall become the organic law of such city and supersede any charter then existing ... and all ordinances inconsistent with said new charter.
Ariz. Const, art. 13, § 2 (emphasis added).
Strode Rule:
[A] city charter ... becomes the organic law of the city and the provisions of the charter supersede all laws of the state in conflict with such charter provisions insofar as such laws relate to purely municipal affairs.
72 Ariz. at 365, 236 P.2d 48 (emphasis added).
¶ 78 The Court in Strode literally rewrote the constitutional provision at issue, which of course it had no power to do. It thus replaced the Constitution’s bright line with a judicially manufactured line of constitutional demarcation between matters of statewide concern, over which the state prevails, and matters of purely local concern, over which charter cities have hegemony. That blurry line is entirely the cause of our muddled jurisprudence over the past two-thirds of a century.
¶ 79 So the question presents itself: should we hew to the Constitution or to our prior decisions? The judicially created doctrine of stare decisis instructs that the rule of law requires stability and continuity, and therefore we should generally follow precedent. Galloway v. Vanderpool, 205 Ariz. 252, 256 *607 ¶ 16, 69 P.3d 23, 27 (2003). But as judges, we take an oath to the Constitution, not to the stare decisis doctrine. Thus, “[wjhile, under our judicial system, all courts have a strong respect for precedent, this respect is a reasonable one which balks at the perpetuation of error, and the doctrine of stare decisis should not prevail when a departure therefrom is necessary to avoid the perpetuation of pernicious error.” State ex rel. La Prade v. Cox, 43 Ariz. 174, 183, 30 P.2d 825 (1934). “Stare decisis is ‘at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.’” Mitchell v. United States, 526 U.S. 314, 343, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (Thomas, J., dissenting) (quoting Agostini v. Felton, 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)); see also Galloway, 205 Ariz. at 256 ¶ 16, 69 P.3d at 27 (stare decisis “is strongest when prior decisions construe a statute”). “The Court has therefore adhered to the rule that stare deci-sis is not rigidly applied in cases involving constitutional issues, and has not hesitated to overrule decisions, or even whole lines of cases, where experience, scholarship, and reflection demonstrated that their fundamental premises were not to be found in the Constitution.” Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 787, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (White, J., dissenting) (internal citation omitted), overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see also id. at 787-88, 106 S.Ct. 2169.
¶ 80 Given that Strode departed so sharply from constitutional text and has spawned constant litigation to ascertain its contours, I would overturn it along with other decisions holding that charter enactments superseded conflicting state laws. See, e.g., City of Tucson v. State, 229 Ariz. 172, 273 P.3d 624 (2012); City of Tucson v. State, 235 Ariz. 434, 333 P.3d 761 (App. 2014); McMann v. City of Tucson, 202 Ariz. 468, 47 P.3d 672 (App. 2002). Instead, I would adhere to the Constitution’s rule that city charters do not supersede conflicting state laws.[3]
¶ 81 The City protests that such a construction would render charters meaningless. Not at all. As the Court observed in AASAE, “Cities and towns, regardless of how organized, have only such powers as are expressly or by implication conferred upon them.” 67 Ariz. at 334-35, 195 P.2d 562. “A municipality has no inherent powers, but only such powers as are expressly conferred by statute or are implied as necessary in aid of those powers which are expressly conferred.” 1 McQuillan Mun. Corp. § 2:10 (3d ed.). By contrast, “[a] presumption exists that the exercise of power by a home rule municipal corporation is valid if no restriction is found in the constitution, the charter itself, or the acts of the general assembly.” 2A McQuillan Mun. Corp. § 10:16 (3d ed.). In other words, a non-charter municipality generally may do only what the state expressly authorizes; a charter city generally may do anything that the state does not expressly forbid. That is a significant difference in authority. At the same time, it is unsurprising that a subdivision of the state would not have the power to override the powers of the state itself.
¶ 82 The Court today performs a salutary service by clarifying the law as much as the Strode construct permits. The Court reaffirms, for instance, that the state retains all police powers to the exclusion of charter cities. Likewise, it usefully disavows the distinction between governmental and proprietary functions, whose foundation is completely lacking in the relevant constitutional text.
¶ 83 The Court also observes that the subject matter at issue here is addressed by our state’s constitutional protection of the right to keep and bear arms in article 2, section 26 of the Arizona Constitution. In my view, that necessarily elevates the subject matter to statewide concern. Tucson contends that its regulation does not limit the constitutional right to “bear arms.” Ariz. Const, art. 2, *608 § 26. The inquiry under current precedents is not whether the charter enactment implicates a constitutional right, but whether it implicates a matter of statewide concern. The state may reasonably determine that destroying firearms limits the quantity of firearms in the market, so that its statute addresses a matter of statewide concern not only pursuant to the state’s police powers but its power to enforce the right to bear arms, Cf. City of Scottsdale v. State, 237 Ariz. 467, 472 ¶¶ 20-21, 352 P.3d 936, 941 (App. 2015) (state is authorized to protect free speech rights, which prevails over conflicting charter enactment).
¶ 84 Although the Court draws the correct lines here, the Constitution makes that exercise unnecessary and improper. I look forward to the day when we no longer have to draw lines between such conflicting enactments, because we finally accept that our Constitution has drawn that line for us.
JUSTICE GOULD,
joined by JUSTICE BOLICK and JUSTICE LOPEZ, concurring in part and in the result.
¶ 85 I concur in Parts I, II, IV, and V of the majority opinion.[4]1 also agree with Part III to the extent the majority concludes we do not have to impose a bond pursuant to A.R.S. § 41-194.01(B)(2). However, I disagree with the majority’s reasoning that imposing the bond “would displace this Court from its constitutionally assigned role under article 6.” Supra, ¶33. Rather, I conclude the bond provision is unenforceable because it is incomplete and unintelligible.
¶86 I also disagree with the majority’s suggestion that we should defer ruling on the bond provision until there is a case “where that issue is specifically raised.” Supra, ¶35. The parties have had a full opportunity to address the enforceability of the bond provision; indeed, both parties have discussed the issue in their briefs. It is squarely before this Court and we must address it.
¶ 87 The bond provision contains two clear directives. First, section (B)(2) requires this Court to impose a bond when a special action is filed by the Attorney General. The statute states that the “court shall require the county, city or town to post a bond equal to the amount of state shared revenue [ (“SSR”) ] paid to the county, city or town pursuant to section 42-5029 and' 43-206 in the preceding six months.” (emphasis added.) By using the word “shall,” the legislature clearly intended the bond provision to be mandatory. See Ins. Co. of N. Am. v. Superior Court, 166 Ariz. 82, 85, 800 P.2d 585 (1990) (“The use of the word ‘shall’ indicates a mandatory intent by the legislature.”).
¶ 88 Second, compliance with the bond provision is not a prerequisite for judicial review. Section (B)(2) requires this Court to determine whether a local ordinance violates state law. The statute does not state, nor does it imply, that our ruling is contingent on a party posting the bond,
¶ 89 Despite these directives, the bond provision fails to provide any direction as to how—or why—this Court should impose the bond. Of greatest concern is the fact that section (B)(2) does not prescribe what occurs if a party fails to post the bond. For example, the statute does not authorize this Court to enter a default in favor of the Attorney General, or to strike the City’s response, In short, the text of the statute does not state, either expressly or impliedly, that failing to post a bond deprives the City of its right to defend the Ordinance before this Court.
¶ 90 The bond provision is incomplete in a number of other areas. Unlike most bond statutes, section (B)(2) contains no provision for reducing the amount of the bond on the basis of economic hardship. Cf. A.R.S. § 12-2108(C) (allowing for reduction of a superse-deas bond upon a showing that the appellant will suffer substantial economic harm). Additionally, section (B)(2) does not identify the conditions for forfeiting or exonerating the bond. Contra, e.g., A.R.S. § 12-1537 (stating that a replevin bond posted by a defendant is exonerated if the attachment is vacated or a judgment is entered for the defendant); AR.S. § 14-5419(1) (a conservator’s bond is *609 exonerated upon filing of a closing statement); A.R.S. § 13-3974 (stating the conditions for exonerating an appearance bond); A.R.S. § 13-3858 (providing for forfeiture of an appearance bond if a defendant fails to appear in court).
¶ 91 Section (B)(2) also does not state the bond’s purpose. If its purpose is to ensure that a city or county complies with state law during the pendency of the Attorney General’s special action, then this is a valid reason for imposing the bond. See Porter v. Commercial Standard Ins. Co., 112 Ariz. 491, 492-93, 543 P.2d 1120, 1121-22 (1975) (stating a supersedeas bond is intended to maintain “the status quo [of the parties] until the appellate process is completed”). But if this is the purpose of the statute, we are left with a puzzling result: under section (B)(1), when the Attorney General determines a local ordinance does violate state law, no bond is required during the thirty-day cure period. However, under section (B)(2), when no final determination has been made regarding a potential violation, a party is required to post a substantial bond while the Attorney General’s special action is pending,
¶ 92 It is difficult to understand why section (B)(2) requires a bond, and section (B)(1) does not, In practice, section (B)(2) creates a greater financial burden when the Attorney General concludes an ordinance “may violate” state law than when the Attorney General concludes an ordinance “does violate” state law. Under section (B)(1), a city or county suffers no economic penalty until there has been a “final” determination that its ordinance violates state law and it has been given thirty days to cure the violation. In contrast, under (B)(2), when the Attorney General determines there may be a violation of state law, the city or county is automatically required to post a bond equal to six months of its SSR.
¶ 93 The parties recognize that the bond provision, as written, is likely unenforceable. The City contends that imposing a bond consisting of six months’ SSR creates an insurmountable financial burden. The City argues that imposing such a large bond would effectively prevent it from defending its Ordinance before this Court. Ariz. Const, art 2, § 13. In contrast, the State asserts that given the City’s agreement to suspend enforcement of its Ordinance pending this litigation, the purpose of the bond is satisfied, and therefore imposing the bond is unnecessary. In the alternative, the State argues that even if the bond is unconstitutional, it is severable from section (B)(2).
¶ 94 In considering these arguments, the majority expresses concern that section (B)(2) places an undue financial burden on the City, Based on this concern, the majority generally agrees with the City that the bond provision may be unconstitutional. Specifically, the majority contends that imposing such a large bond “would likely dissuade” the City from defending its Ordinance, which in turn would “displace this Court from its constitutionally assigned role under article 6 of interpreting Arizona’s constitution and laws.” Supra, ¶33; Ariz. Const, art 6, § 1.
¶ 96 If the majority is indeed concerned that the bond provision may be unconstitutional on this basis, I disagree. Generally, we afford statutes a presumption of constitutionality. Cf. Gallardo v. State, 236 Ariz. 84, 87 ¶ 9, 336 P.3d 717, 720 (2014) (discussing presumption of constitutionality generally afforded legislative enactments). Additionally, the record is undeveloped as to the actual bond amount the City will have to post. There has been no evidentiary hearing in this case. We have no testimony from witnesses, no exhibits or any other evidence showing the actual financial impact on the City. All we have are allegations by the City that it lacks the financial means to post the bond. And these allegations appear to be based on the assumption that section (B)(2) requires the City to post the full amount of the bond as a cash bond. However, section (B)(2), by its terms, does not prohibit the City from posting a security bond to satisfy the bond requirement. We have no evidence before us as to whether the City could post such a security bond.
¶ 96 The majority also concludes that based on the City’s agreement to suspend enforcement of its Ordinance, imposing the bond is unnecessary in this ease. I recognize this is a practical approach to dealing with the deficiencies of the statute. However, sec *610 tion (B)(2) does not, by its terms, authorize waiving the bond requirement based on such an agreement. In the face of such a mandatory provision, we must either impose it, or explain why it is unenforceable.
¶ 97 At bottom, the problem with the bond provision is not ambiguous language or undefined terms. Rather, it is, in several material respects, so incomplete as to be unintelligible. The result is a partial, unfinished legislative directive that is impossible for this Court to enforce. Cf. Cohen v. State, 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978) (stating “it is the duty of a court in construing a statute to strive to uphold it whenever possible.”).
¶ 98 Under these circumstances, I would declare the bond provision unintelligible and unenforceable, and provide the Legislature with an opportunity to fix it. The unintelligi-bility doctrine is a well-established doctrine that has been applied in several states. See Board of Trustees of Judicial Form Retirement System v. Attorney General of Com., 132 S.W.3d 770, 779-81 (Ky. 2003); Yeik v. Dept. of Revenue and Taxation, 595 P.2d 965, 968-69 (Wyo. 1979); State ex rel. Miller v. Brown, 167 Ohio St. 452, 150 N.E.2d 46, 48 (1958); Davidson Bldg. Co. v. Mulock, 212 Iowa 730, 235 N.W. 45, 54-56 (1931); Midwest Hotel Co. v. State Board of Equalization, 39 Wyo. 461, 273 P. 696, 697-99 (1929); State ex rel. Hughes v. Reusswig, 110 Minn. 473, 126 N.W. 279, 280 (1910); Ward v. Ward, 37 Tex. 389, 392 (1872); see also Antonin Sealia & Bryan A. Garner, Reading Lem: The Interpretation of Legal Texts 134-138 (2012) (discussing the “Unintelligibility Canon” of statutory construction, which holds that an unintelligible, incomplete statute is unenforceable).
¶ 99 A careful reading of Ethridge v. State Bd. of Nursing, 165 Ariz. 97, 104, 796 P.2d 899, 906 (App. 1989) and State Compensation Fund v. De La Fuente, 18 Ariz. App. 246, 251-52, 501 P.2d 422 (1972) also supports the existence of the unintelligibility doctrine in Arizona. In Ethridge, the court stated that “[a]n indefinite and incomplete statute may be held invalid on three bases: (1) the language used may not have sufficient legal significance to be capable of intelligent execution; (2) the statute may unduly delegate legislative powers in violation of the separation of powers doctrine under article 3 of the United States Constitution, and (3) as applied, the statute may violate due process under the Arizona Constitution.” (emphasis added) Id., 165 Ariz. at 104, 796 P.2d at 906. Importantly, the first category mentioned— “the language used may not have sufficient legal significance to be capable of intelligent execution”—is identified as a separate, distinct basis from the other two grounds. Similarly, De La Fuente lists “three bases upon which a statute without the requisite definiteness and completeness may be held invalid,” including “the language used may not have sufficient legal significance to be capable of intelligent execution.” Id., 18 Ariz. App. at 251-52, 501 P.2d 422 (emphasis added).
¶ 100 Generally, if a statute is ambiguous, courts apply a void-for-vagueness analysis. The unintelligibility doctrine, however, is distinct from this doctrine. See, supra ¶103. The void-for-vagueness doctrine is typically applied to ambiguous or indefinite statutes involving criminal or punitive civil laws, or laws involving First Amendment rights, that are applied to members of the general public. See, e.g., State v. Holle, 240 Ariz. 300, 310 ¶ 46, 379 P.3d 197, 207 (2016) (holding that statutes defining crimes for sexual abuse and child molestation provided sufficient notice to the public of the proscribed conduct, and are not void for vagueness); Western Waste Serv. Sys. v. Superior Court, 120 Ariz. 90, 584 P.2d 554 (1978) (holding that Arizona Uniform Antitrust Act provision imposing treble damages for a “flagrant” violation of the statute was not void for vagueness). In contrast, the unintelligibility doctrine is reserved for incomplete, non-punitive civil statutes that are oftentimes directed at judicial procedures. Board of Trustees, 132 S.W.3d at 778; cf. De La Fuente, 18 Ariz. App. at 251-52, 501 P.2d 422 (statute concerning authority of Industrial Commission to determine death benefits lacked any standards or regulations to govern Commission’s decision; as a result, the statute was declared unenforceable on multiple grounds, including unintelligibility).
¶ 101 For example, in Yeik a statute provided that before a person could appeal a driver’s license suspension to the district *611 court, he was first required to file an appeal with the “revenue and tax commission.” The statute, however, provided no regulations or directions as to how to pursue an appeal to the commission. In holding the statute was unenforceable as incomplete and unintelligible, the court stated:
Those wishing to seek review from the tax commission are given no guidance by the rules and regulations as to: 1. Within what time frame must the appeal be effected? 2. What notice of appeal is required? 3. Is the decision of the hearing examiner stayed during the pendency of the review process or must the party seeking review specifically ask for such a stay? 4. Must the party seeking review write a brief? 5. Does the party seeking review have a right or obligation to present oral argument to the tax commission? There are a host of other unanswered procedural questions that the state tax commission must answer in the form of Reasonable rules and regulations before s 31-7-105(c) can have any real meaning.
Yeik, 595 P.2d at 968. See also Ward, 37 Tex. at 391-92 (statute was unenforceable because the procedures for filing an appeal from an interlocutory order were incomplete and unintelligible); Midwest Hotel, 273 P. at 697 (procedures for filing an appeal from the board of equalization were incomplete, and therefore unenforceable); Davidson, 235 N.W. at 54-56 (statute was unenforceable because procedures for appealing from a tax board of review decision were so indefinite and incomplete as to be unintelligible).
¶ 102 The unintelligibility doctrine is perhaps the quintessential example of how a court, acting with restraint, observes its constitutional role under the separation of powers. See Board of Trustees, 132 S.W.3d at 781 (stating “the unintelligibility rule has its foundation in the constitutional requirement of separation of powers”); see also U.S. Const, art. I—III; Ariz. Const, art. 3. When faced with an incomplete, unintelligible statute, a court may either attempt to re-write the statute, or declare it unenforceable. Id. The first option is a clear violation of the separation of powers. Courts lack the constitutional authority to legislate, and this limitation is perhaps most acute when a court attempts to enforce a statute that, by virtue of its incompleteness, is really no law at all. See Ballesteros v. Am. Standard Ins. Co. of Wis., 226 Ariz. 345, 349 ¶ 17, 248 P.3d 193, 197 (2011) (stating “[i]f the legislature desires to add [] a requirement [to A.R.S. § 20-259.01], it may do so ... but it is not our place to rewrite the statute”). In contrast, when a court declares an incomplete, unfinished statute unenforceable on the grounds of unintelligibility, it refrains from stepping outside its judicial authority, and provides the legislature with an opportunity to address the infirmities in the statute.
¶ 103 Thus, I conclude that because the bond provision is incomplete and unintelligible, it is unenforceable.

. Applying the constitutional rule would preserve judicial analysis of whether the state's statute occupies the field of regulation and conflicts with the charter city provision. If it does not, the city's provision should stand. See, e.g., Babe's Cabaret v. City of Scottsdale, 197 Ariz. 98, 103-04 ¶¶ 18-19, 3 P.3d 1018, 1023-24 (App. 1999); City of Tucson v. Rineer, 193 Ariz. 160, 163 ¶¶ 7-9, 164 ¶ 11, 971 P.2d 207, 210 (App. 1998).

. My concurring colleague, Justice Bolick, does not join Part III of the Court’s opinion. See ¶¶ 66-84, supra.